THE STRATTON CLAIMANTS *v*. THE MORRIS CLAIMANTS.

## (*Nashville.* January 13, 1891.)

1. CONSTITUTIONAL LAW. *Measure and limits of legislative power in this State.*

In Tennessee it is a settled doctrine of constitutional·law that "the legislative power of the General Assembly of this State extends to every subject except in so far as it is prohibited either by the delegated powers of the Federal Government or by the restrictions of our own Constitution. He who would show the unconstitutionality of an Act of the Legislature, must be able to put his finger upon the provision of the constitution violated." (*Post, pp. 511, 512.*)

Cases cited and approved: Demoville & Co. *v.* Davidson County, 87 Tenn., 220; Davis *v.* State, 3 Lea, 377; Luehrman *v.* Taxing District, 2 Lea, 438; Hope *v.* Deaderick, 8 Hum., 8; Bell *v.* Bank, Peck, 269, 270.

2. SAME. *Same.*

And therefore the Courts cannot annul a statute which is free from other exception, upon any assumption that it is opposed to the "eternal principles of justice," or to "natural equity," or to "the inherent rights of freemen," or to some vague and general spirit that is supposed to pervade the Constitution, but not expressed therein. (*Post, pp. 511-513.*)

Cases cited and approved: Davis *v.* State, 3 Lea, 378; Luehrman *v.* Taxing District, 2 Lea, 438.

Cited: Bank *v.* Cooper, 2 Yer., 603.

3. SAME. *Same. An important consideration.*

But, "in considering State Constitutions, we must not commit the mistake of supposing that because individual rights are guarded and protected by them, they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights of the governed. A Constitution is not the beginning of a community nor the origin of private rights; it is not the foundation of law nor the incipient state of government; it is not the cause, but the consequence, of personal and political

32—5 P

freedom; it grants no rights to the people, but is the creature of their power, the instrument of their convenience, designed for their protection in the enjoyment of the rights and powers which they possessed before the Constitution was made; it is but the frame-work of the political government, and necessarily based upon the pre-existing condition of laws, rights, habits, and modes of thought." (*Post, pp. 512, 513.*)

Cited: Cooley's Con. Lim., p. 358.

4. SAME. *Conditions existing at date of formation of our Constitution.*

When the Constitution of this State was formed, "the right to acquire, to hold, to enjoy, to alien, to devise, and to transmit property by inheritance to our descendants in regular order and succession" was "enjoyed to the fullness and perfection of absolute right," and one of the objects of the Constitution was to protect and preserve this right. (*Post, pp. 513–515.*)

Case cited and approved: Hughlett *v.* Hughlett, 5 Hum., 464.

5. DESCENT AND DISTRIBUTION. *Act of 1885 changing laws of descent and distribution with reference to lunatics. Unconstitutional.*

Act of 1885, Ch. 88, changing our laws of descent and distribution with reference to estates of lunatics is unconstitutional and void. That Act provides that the personal estate of which a "lunatic or *non compos mentis*" dies intestate, if derived from an intestate husband or wife, shall go, not to the next of kin of such "lunatic or *non compos mentis*," as in case of other intestates, but to the next of kin of the person from whom the estate was derived. (*Post, pp. 506, 507.*)

Act construed: Acts 1885, Ch. 88.

6. SAME. *Same. Terms "lunatic or non compos mentis" defined.*

The terms "lunatic or *non compos mentis*" are used in this Act to denote a person who has not sufficient mental capacity to make a will. (*Post, p. 507.*)

7. SAME. *Same. Same. Sufficiency of the evidence.*

The evidence set out, in the Court's opinion, is held sufficient to establish that the intestate whose estate is involved was a "lunatic or *non compos mentis*" within the meaning of this Act. (*Post, pp. 507–511.*)

8. CONSTITUTIONAL LAW. *Act of 1885 does not deprive intestate lunatic's next of kin of property.*

This Act of 1885 does not deprive an intestate lunatic's next of kin of *property* within the meaning of the constitutional prohibition that no man shall be deprived of "his property but by the judgment of his peers or the law of the land," even when the Act is applied to a lunatic who, before its passage, had acquired personal estate of an intestate husband or wife, and continued to be a lunatic and died intestate after the Act had been passed. The expectancy of next of kin is not *property*. (*Post, pp. 515–518.*)

Constitution construed: Art. I., Sec. 8.

9. SAME. *But this Act deprives the intestate lunatic of property.*

But this Act of 1885, if valid, would deprive the "lunatic or *non compos mentis*" himself of that which is recognized as *property* within the constitutional prohibition aforesaid, to wit: The right to transmit his property by inheritance to his *own* descendents or next of kin. (*Post, pp. 518–521.*)

Constitution construed: Art. I., Sec. 8.

10. SAME. *Act of 1885 not valid, because it is not the "law of the land."*

A statute which deprives any one of property is not valid unless it is the "law of the land." This Act of 1885 is not the "law of the land," because (1) the classification upon which it is based is "unnatural, arbitrary, and capricious;" and (2) it operates to take private property for private use, contrary to an implied prohibition of the Constitution. (*Post, pp. 541, 542.*)

11. SAME. *"Law of the land." Definition of.*

"Law of the land" correctly defined means a law "which embraces all persons who are or may come into like situation and circumstances." It may be made to extend to all citizens, or be confined, under proper limitations, to particular classes. If the class be a proper one, it matters not how few the persons are who may be included in it. (*Post, pp. 521–523.*)

Constitution construed: Art. I., Sec. 8.

Cases cited and approved: Vanzant *v.* Waddell, 2 Yer., 270, 271; Wally *v.* Kennedy, 2 Yer., 555; Bank *v.* Cooper, 2 Yer., 605; Jones *v.* Perry, 10 Yer., 71, 72; Sheppard *v.* Johnson, 2 Hum., 296; Budd *v.* State, 3 Hum., 491; State *v.* Burnett, 6 Heis., 189; McKinney *v.* Hotel Company, 12 Heis., 107; Mayor *v.* Dearmon, 2 Sneed, 122; State *v.*

Rauscher, 1 Lea, 97; Davis *v.* State, 3 Lea, 379; Maney *v.* State, 6 Lea, 221; Hatcher & Lea *v.* State, 12 Lea, 370; Woodard *v.* Brien, 14 Lea, 523.

12. SAME.    *Same.    Essentials to validity of statutes based upon classifications.*

"Whether a statute be public or private, general or special, in form, if it attempts to create distinctions and classifications between the citizens of this State, the basis of such classification must be natural, and not arbitrary.    If the classification is made under Article XI., Section 8, of the Constitution for the purpose of conferring upon a class the benefit of some special right, privilege, immunity, or exemption, there must be some good and valid reason why that particular class should alone be the recipient of the benefit.    If the classification is made under Article I., Section 8, of the Constitution for the purpose of subjecting a class to the burden of some special disability, duty, or obligation, there must be some good and valid reason why that particular class should alone be subject to the burden." (*Post, pp. 522–535.*)

Constitution construed: Art. I., Sec. 8; Art. XI., Sec. 8.

Cases cited and approved:

*Sustaining statutes:* Demoville *v.* Davidson County, 87 Tenn., 218–223; State *v.* Schlier, 3 Heis., 286; Fulghum *v.* Mayor, 8 Lea, 635; Robbins *v.* Taxing District, 13 Lea, 303; State *v.* Rauscher, 1 Lea, 96; Theilan *v.* Porter, 14 Lea, 627; Parks *v.* Parks, 12 Heis., 634; Davis *v.* State, 3 Lea, 380; Jones *v.* Perry, 10 Yer., 75.

*Declaring statutes unconstitutional:* Hatcher & Lea *v.* State, 12 Lea, 370–371; Morgan *v.* Reed, 2 Head, 275; Memphis *v.* Fisher, 9 Bax., 239; Brown *v.* Haygood, 4 Heis.,360; Wally *v.* Kennedy, 2 Yer., 554; Bank *v.* Cooper, 2 Yer., 599; Budd *v.* State, 3 Hum., 492; McKinney *v.* Hotel Company, 12 Heis., 104; Daly *v.* State, 13 Lea, 232; Burkholtz *v.* State, .16 Lea, 72, 73; Woodard *v.* Brien, 14 Lea, 522; Neely *v.* State, 4 Lea, 316; Green & Currey *v.* State, 15 Lea, 708–710; Ragio *v.* State, 86 Tenn., 272.

13. SAME.    *Same.    Must not violate any provision of the Constitution.*

"A law which violates any provision of the Constitution, whether the provision be express or implied, cannot be the 'law of the land,' because an unconstitutional law is, in fact, no law at all." (*Post, p. 536.*)

14. SAME.    *Same.    Taking private property for private use prohibited by Con stitution.*

"Though the Constitution does not expressly prohibit the taking of

The Stratton Claimants *v.* The Morris Claimants.

private property for private use, yet it has been held to do so by implication," and therefore a statute cannot be the "law of the land" which takes the private property of one person to give it to another for the latter's private use.  (*Post, p. 535.*)

Constitution construed: Art. I., Sec. 8.

Cases cited and approved: Harding *v.* Goodlett, 3 Yer., 52; Clack *v.* White, 2 Swan, 549; Memphis Freight Co. *v.* Mayor, etc., 4 Cold., 425.

---

FROM DAVIDSON.

---

Appeal from Chancery Court of Davidson County. JOHN A. FITE, J., sitting by interchange.

DEMOSS & MALONE, N. D. MALONE, W. G. BRIEN, STEGER, WASHINGTON & JACKSON, JOHN L. KENNEDY, and VERTREES & VERTREES for Stratton Claimants.

MARKS & MARKS, EAST & FOGG, HILL & GRANBERY, and JOHN LELLYETT, JR., for Morris Claimants.

*ED. BAXTER, Sp. J.  K. J. Morris, when about sixteen or seventeen years old, began mercantile life as a clerk in a store in Nashville.  He was very poor, but, being industrious and economical, he saved money from his salary.  In 1842 he married Jane M. Stratton.  In 1845 he became a member of the partnership of Lanier, Morris, & Co., and he contributed $4,000 as his share of the capital of that firm.  About one month before the forma-

---

*Ed. Baxter, Esq., of the Nashville Bar, was appointed by the Governor to sit at this term on the hearing of this case and some others in which some member of the Court was incompetent.

tion of said partnership he and his wife sold a negro woman and three children for $1,175. The negro woman had been bequeathed to Mrs. Morris by her aunt, but there is nothing to show that Morris used the proceeds of the sale in contributing his share to the capital of said firm, except the fact that his financial condition at the time renders it probable that he was compelled to do so. His connection with that firm was the foundation of his success, which, while slow, was steady and sure. His estate at his death was valued at over $200,000.

The early years of his married life were as happy as they were prosperous. His wife was a home-staying, husband-loving woman. She was quiet and retiring in her disposition, industrious and economical in her habits. She made most of her own clothing, and much of her husband's underwear. She was an excellent house-keeper, and a fine manager. How much her wise and economical management of their household affairs may have contributed to her husband's financial success in life, we have no means of knowing.

She had but one child, a son, and he was her idol. In 1861, when he was about seventeen years old, he was accidentally killed, and she was never the same woman afterward. She withdrew from society, became gloomy and melancholy in her disposition, and would frequently fall into spells of uncontrollable weeping. In 1882 she was fearfully afflicted with carbuncles. The disease finally merged

into catalepsy, and her mind became visibly and seriously impaired.

On April 19, 1884, her husband died intestate and without issue, leaving his wife surviving him. His real estate was valued at $100,000 and his personal estate at $120,000. According to the statutes of descent and distribution then in force, his real estate went to his heirs at law, and his personal estate went to his widow; and if those statutes had remained in force, and she had died intestate, unmarried, and without issue, the personal estate inherited by her from her husband would have gone to her next of kin.

On April 24, 1884, just five days after her husband's death, her brother, Madison Stratton, who is one of the complainants, filed a petition against Mrs. Morris in the County Court of Davidson County, in which petition he averred that she was then "a lunatic or a person of unsound mind," and had been for nearly or quite two years; and that, by reason of her mental infirmities as aforesaid, she was "entirely incapable of managing or in any way controlling her said property and estate, or of taking care of her own person." Mr. Kennedy, one of the solicitors who signed the petition, is the husband of one of the nieces of Mrs. Morris.

A guardian *ad litem* was appointed for Mrs. Morris, testimony was taken, and the jury of inquest found that she was a person of unsound mind, so that she had not capacity sufficient for

the government of herself and her property; that the said unsoundness of mind and mental incapacity had "existed for about eighteen months, and that it resulted principally, if not wholly, from physical afflictions and from physical causes." The verdict of the jury was made the judgment of the Court on the first day of May, 1884, and a guardian of her person and property was appointed, who is the husband of one of her nieces.

She remained under said guardianship until her death. At the first session of the Legislature which met after she had been declared a lunatic, Mr. Robert L. Morris, a nephew of her husband, prepared a bill, which was passed by the Legislature April 1, 1885, as Chapter 88 of the Acts of 1885, the effect of which, if constitutional, will be to give the personal estate which Mrs. Morris inherited from her husband to her husband's next of kin instead of to her own, provided it shall be found that she was "a lunatic or *non compos mentis.*"

Mr. Morris says that he spoke to five members of the Legislature regarding the passage of the law, explaining to them its scope and bearing, and its effect upon the estate of K. J. Morris. He spoke to them of the hardship of the existing statute of descent and distribution as illustrated by this estate, and that there was a chance to modify one of its defects; namely, that which gave all of an intestate husband's personal property to his widow in the absence of children.

Mr. Morris also talked with Governor Bate

about the law, explaining to him, among other things, what effect it would have upon the estate of Mrs. Morris. The Governor said that he was equally friendly with the Stratton and Morris families, but would approve the law on its merits, as he regarded it a good law.

Mr. Morris says that he did not speak to any member of the Morris family about the introduction of the law, nor communicate with them in any way concerning it; but after its passage had been recommended by the judiciary committee, he mentioned it to several persons who were members of or connected with that family.

Mr. Morris charged no fee for any thing done in connection with the passage of the Act, and he never received any compensation for his services. There is nothing whatever in the record to even intimate that he resorted to any sinister methods to influence the action of the members of the Legislature.

On the other hand, there is nothing to show that any member of the Stratton family had any notice that such a bill had been introduced into the Legislature until after the Legislature had adjourned.

Mr. Kennedy states that Mr. Morris never told him of the law until Mr. Kennedy found it in the published Acts of 1885 and called his attention to it.

Mrs. Morris continued under guardianship until December 19, 1888, when she died intestate, unmarried, and without issue.

On December 20, 1888, Mr. Dibrell was appointed her administrator, and on January 10, 1889, he filed a bill in the nature of a bill of interpleader against the next of kin of K. J. Morris, and the next of kin of his widow, to settle the question as to which of them are entitled to the personal estate which the widow inherited from her husband.

The next of kin of the widow, who for brevity will be hereafter styled the "Stratton claimants," insist that they are entitled to said personal estate, under the general statute of distribution of the State contained in § 2429 of the Code of 1858.

The next of kin of K. J. Morris, who for brevity will be hereafter styled the "Morris claimants," insist that they are entitled to said estate under said Act of April 1, 1885, which is as follows:

"AN ACT to amend ₴ 3278 of the Code of Tennessee by Milliken & Vertrees (₴ 2429 of the Code).

" SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That § 3278 of the Code of Tennessee by Milliken & Vertrees be amended as follows: If the personal estate as to which any person dies intestate, and who was a lunatic or *non compos mentis,* was derived in whole or in part from an intestate husband or wife, then in that event so much of the personal estate as was derived and remains unexpended or in the possession of any guardian or custodian of the estate of said lunatic or *non compos mentis,* shall go to the next of kin of the person from whom it was so derived,

said next of kin to take in the order named in said section in the case of the personal estate of intestates.

"SEC. 2. *Be it further enacted,* That this Act take effect from and after its passage, the public welfare requiring it."

"Passed April 1, 1885; approved April 6, 1885."

The Stratton claimants insist that said Act has no application to the estate of Mrs. Morris, because, as they say, she was not a "lunatic or *non compos mentis,*" within the meaning of those terms as used in said Act; and they further insist that said Act is in violation of several provisions of the Constitution of the State of Tennessee.

We think that the Legislature used the words "lunatic or *non compos mentis*" in the Act to denote a person who has not sufficient mental capacity to make a will; and, therefore, the first question is, whether Mrs. Morris, at the time of her death, was possessed of "a sound and disposing mind and memory."

Since the passage of the Act of 1885 a bitter controversy has arisen between the Morris family and the Stratton family, and most of the witnesses belong to, or are allied with, one or the other of those families. The testimony of all such witnesses, taken since the passage of said Act, is subject to criticism, as being affected more or less by interest or prejudice. But the testimony taken upon the inquisition of lunacy in 1884, before said Act of

the Legislature was passed, is subject to no such criticism. The inquisition was instituted and prosecuted by the Stratton family, and, though certain members of the Morris family were examined as witnesses before the jury, they were doubtless introduced by the petitioner, Madison Stratton, who was a brother of Mrs. Morris; and at the time they gave their testimony, they had no idea that they would ever be interested in the estate of Mrs. Morris.

At the inquisition Dr. Thomas L. Maddin testified that he had been her husband's family physician for twenty-five years. He says: "I think she is a person of unsound mind, to the degree that she is not capable of governing herself or her property. Her mind is impaired by this disease. At times she has lucid intervals, in this sense: She recognizes her friends, and sometimes speaks in monosyllables of three or four words. I do not think she could give directions about her estate. If asked to sell a piece of property she could not do so; she has not sufficient mind to make negotiations concerning property; she has not sufficient mind to govern herself or property; she has not sufficient capacity to care for herself or property, and has not had, for eighteen months or more, except for minor physical wants."

Dr. John H. Callender, Superintendent of the Tennessee Asylum for the Insane, testifies as follows: "Her physician and nurse described to me her disease and accompanying symptoms, and the

nature of her attacks; my opinion from these, and my observation and diagnosis of her case, was that her insanity and imbecility was progressive in character, and that it would end in final dementia. At the time of my visits she was so unsound in mind as to be wholly incapacitated to govern herself in person or property."

All of the non-expert witnesses examined at the inquisition expressed the opinion that she was of unsound mind, and they stated the facts upon which their opinions were based.

It is true that after she was placed under guardianship there was a steady and marked improvement in her condition, both physical and mental, and it is barely possible that if she had lived a few years longer her mind might have been completely restored. But we do not think that her mental condition ever improved, in fact, sufficiently to have enabled her to make a valid will.

Mr. Dibrell, who was her guardian, and the husband of one of her nieces, testifies that she was not capable of managing her affairs, or of comprehending her property or her property rights; that he did not think she had the capacity to make a will; that she had no conception of her estate, and never asked about it, or how it was being used or disposed of; and that he did not think she could have been intrusted to buy a calico dress.

When Dr. Thomas L. Maddin was cross-exam-

ined in this cause he was asked whether Mrs. Morris, to the close of her life, ever became mentally competent to buy and sell property, make a will, and transact business without the aid of a guardian. His answer was: "She was absolutely unable to do or say any thing, or to communicate her wishes; and therefore, as regards her mental state, it was impossible to know either its range of subjecting capacity or wish."

Dr. Callender, when examined in this cause, said: "At no period of my observation of her after Mr. Morris' death did I regard her as capable, mentally, of taking care of her person, or of managing her property or affairs, or of fully comprehending any but the simplest current events in her presence, and at all times not even them; and during all of the period of my visitation, though her physical health was sometimes quite improved, she was invalid in body as well as mentally incompetent personally for the performance of any civil act. I saw her the last time about two weeks before her death."

A significant circumstance connected with the question of mental capacity after the passage of the Act of 1885, is the fact that, though she lived more than three years after that Act was passed, neither she nor any of the Stratton claimants ever suggested the propriety of her making a will.

If she had made a valid will it would have at once taken the case out of the Act of 1885;

and the fact that no one ever suggested the idea of her making a will is persuasive evidence that the Stratton claimants did not believe that she had the mental capacity to do so.

We agree with the Chancellor that Mrs. Morris was at the time of her death a lunatic, or person *non compos mentis*, within the purview and meaning of Chapter 88 of the Acts of Tennessee of 1885.

The second question is as to the constitutionality of said Act. It was said by Judge Green, in *Bank* v. *Cooper*, 2 Yer., 603, that "there are certain eternal principles of justice which no government has a right to disregard. It does not follow, therefore, because there may be no restriction in the Constitution prohibiting a particular Act of the Legislature, that such Act is therefore constitutional."

Mr. Justice Miller said that "it must be conceded that there are such rights in every free government beyond the control of the State." *Loan Association* v. *Topeka*, 20 Wall., 662.

And Judge Cooley says that "there was never a written republican constitution which delegated to functionaries all the latent powers which lie dormant in every nation, and are boundless in extent and incapable of definition." Cooley's Con. Lim., pp. 37, 175.

The doctrine of this Court, however, is that "the legislative power of the General Assembly of this State extends to every subject, except in so

far as it is prohibited either by the delegated powers of the Federal Government or by the restrictions of our own Constitution. He who would show the unconstitutionality of an Act of the Legislature must be able to put his finger upon the provision of the Constitution violated." *Demoville & Co.* v. *Davidson County*, 3 Pickle, 220; *Davis* v. *State*, 3 Lea, 377; *Luehrman* v. *Taxing District*, 2 Lea, 438; *Hope* v. *Deaderick*, 8 Hum., 8; *Bell* v. *Bank*, Peck, 269, 270. See also Cooley's Con. Lim., p. 173.

"A statute cannot be annulled upon supposed natural equity, the inherent rights of freemen, or any general and vague interpretation of a provision of the Constitution beyond its plain and obvious import." *Davis* v. *State*, 3 Lea, 378.

"The Courts are not at liberty to declare an Act void because it is, in their opinion, opposed to a spirit supposed to pervade the Constitution, but not expressed in words." *Luehrman* v. *Taxing District*, 2 Lea, 438; Cooley's Con. Lim., p. 171.

But, "in considering State Constitutions, we must not commit the mistake of supposing that because individual rights are guarded and protected by them, they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights of the governed. A Constitution is not the beginning of a community nor the origin of private rights; it is not the foundation of law nor the incipient state of government; it is not

the cause, but the consequence, of personal and political freedom; it grants no rights to the people, but is the creature of their power, the instrument of their convenience, designed for their protection in the enjoyment of the rights and powers which they possessed before the Constitution was made; it is but the frame-work of the political government, and necessarily based upon the pre-existing condition of laws, rights, habits, and modes of thought." Cooley's Con. Lim., pp. 36, 37.

"The right to private property is a sacred right. It was not introduced as the result of princes' edicts, concessions, and charters, but it was the old fundamental law, springing from the original frame and constitution of the realm." Cooley's Con. Lim., p. 358.

"The sense of property is inherent in the human breast, and the gradual enlargement and cultivation of that sense from its feeble force in the savage state to its full vigor and maturity among polished nations forms a very instructive portion of the history of civil society. The exclusive right of using and transferring property follows as a natural consequence from the perception and admission of the right itself." 2 Kent's Com., pp. 318, 320.

"The power of alienation of property is a necessary incident to the right of property, and was dictated by mutual convenience and mutual wants." 2 Kent's Com., 326; Cooley's Con. Lim. (4th Ed.), top page 493, note 1.

33—5 P

" The right to transmit property by descent . to one's own offspring is dictated by the voice of nature. The universality of the sense of a rule or obligation is pretty good evidence that it has its foundation in natural law." 2 Kent's Com., p. 326.

" In the early periods of the English law a man was never permitted to totally disinherit his children, or leave his widow without provision. The Roman law would not allow a man to disinherit his own issue without some just cause assigned in his will. The reason of the rule in the civil law was that the children were considered as having a property in the effects of the father." 2 Kent's Com., p. 327.

One of the provisions of Magna Charta was " that the goods of every freeman should be disposed of according to his will, or, if he died intestate, that his heirs should succeed to them." Craik & Macfarlane's History of England (Vol. I.), 558; Blackstone's Com., Book 4, 424.

" In America the right to acquire, to hold, to enjoy, to alien, to devise, and to transmit property by inheritance to our descendants in regular order and succession, is enjoyed to the fullness and perfection of absolute right." 2 Kent's Com., pp. 327, 328.

" In ancient times if a man died without making any disposition of his goods and chattels the king, as *parens patriæ*, seized them, but not for his own use. He seized them to the intent that

they should be preserved and disposed of for the burial of the deceased, the payment of his debts, to advance his wife and children, if he had any, and if not, then those of his blood." *Hughlett* v. *Hughlett*, 5 Hum., 464.

Having ascertained how the rights of property existed in this State when the Constitution was formed, and that one of the objects of the Constitution was to protect and preserve those rights, we will next proceed to examine whether the Act of 1885 violates any of the provisions of that Constitution.

It is insisted that it violates so much of Article I., Section 8, as provides that no man shall be deprived of his "property but by the judgment of his peers or the law of the land."

It is not contended that the Act of 1885 has deprived any one of the right of trial by jury, and therefore said Act cannot be shown to violate that provision of the Constitution, unless it can be established, first, that it has deprived some one of "property;" and, second, that it is not the "law of the land."

Any citizen may be deprived of his property by a statute, provided the statute is what is known as the "law of the land." It is when a statute is not the "law of the land" that a citizen cannot be deprived of his property under it.

The first inquiry, then, is as to whether any one has been deprived of *property* by the Act of 1885.

It is insisted that the next of kin of Mrs. Morris were not deprived of any property, because the personal property which she inherited from her husband did not belong to them, and they, at most, had a mere expectancy in regard to it. The law upon this point is thus stated by Judge Cooley: "A right cannot be considered a vested right unless it is something more than such a mere expectancy as may be based upon an anticipated continuance of the present general laws; it must have become a title, legal or equitable, to the present or future enjoyment of property. And it is because the mere expectation of property in the future is not considered a vested right that the rules of descent are held subject to change in their application to all estates not already passed to the heir by the death of the owner. No one is heir to the living, and the heir presumptive has no other reason to rely upon succeeding to the property than the promise held out by the statute of descents. But this provision is no more than a declaration of the Legislature as to its present view of public policy as regards the proper order of succession—a view which may at any time change, and then the promise may properly be withdrawn, and a new course of descent be declared. The expectation is not property; it cannot be sold or mortgaged; it is not subject to debts; and it is not in any manner taken notice of by the law until the moment of the ancestor's death, when the statute of descents comes in, and, for reasons

of general public policy, transfers the estate to persons occupying particular relations to the deceased in preference to all others. It is not until that moment that there is any vested right in the person who becomes heir to be protected by the Constitution.

"An anticipated interest in property cannot be said to be vested in any person, so long as the owner of the interest in possession *has full power, by virtue of his ownership, to cut off the expectant right by grant or devise.*" Cooley's Con. Lim., pp. 359, 360.

It seems that under the civil law the children were considered "as having a property in the effects of the father," because under that law "he could not disinherit his own issue without some just cause assigned in his will" (2 Kent's Com., p. 237); while at common law the children were not considered as having a property in the effects of the father, because under that law he could disinherit his own issue without assigning any cause therefor in his will. But where the father becomes hopelessly insane before making his will, and so remains until his death, he practically has no more power to disinherit his children, under the common law, than he would have had under the civil law. And if children are considered as having a property in the effects of a sane father, under the civil law, it is difficult, at first blush, to see why the children of an insane father would not have a property in his effects under the

common law. The reason, however, is that however hopeless the insanity may appear to be, there is always a possibility of recovery, and the ever-presence of that possibility prevents the expectations of the children from being recognized as vested rights of property.

We are therefore of opinion that the personal property which Mrs. Morris inherited from her husband was not the property of her next of kin, and therefore that they were not deprived of it by the Act of 1885.

It is next insisted that Mrs. Morris was not deprived of said property. It is conceded that it became her property at the death of her husband, and that it remained her property up to the time of her death.

It is said, however, that the Act of 1885 did not interfere in the least with her possession or enjoyment of the property during her life, and as her title and ownership was extinguished by her death, she could not have been deprived of it, by the Act of 1885, at any time.

The argument is that the death of the owner extinguished her title and ownership; that the dead can have no vested property rights; that the power of the State to take the property of decedents and dispose of it as it chooses is unqualified; and therefore that the State had the right to take the property, at the death of Mrs. Morris, and make "a gift" of it to persons who were strangers to her in blood.

We cannot assent to this argument. Ordinarily no one can make a complete and valid "gift" of property unless he be the full legal and equitable owner thereof, and it is not shown when or how the State ever acquired any such ownership of the property here in controversy. Was it by gift, or purchase, or bequest from Mrs. Morris? If so, where is the evidence of any such change of title? Was it by escheat, or under the statute of distribution? If so, where is the statute under which the State derived its title, either by way of escheat or as distributee of Mrs. Morris?

The contention must necessarily be that the State, while having no beneficial ownership in the property, had an absolute power of disposition over it. But this power of disposition must have been conferred upon the State either by Mrs. Morris, who was the owner of the property, or by the Constitution, or by the common law. It is not pretended that Mrs. Morris ever invested the State, as trustee or otherwise, with any such power of disposition over her property. No provision can be found in the Constitution authorizing the State to make any disposition of the property of an intestate citizen who leaves next of kin capable of inheriting. The only remaining source of power must be the common law; and we do not understand that any such power was ever conferred by that law upon the king. On the contrary, so far from the king having the unqualified power to take and dispose of the property of intestates, the

power, if it had ever been exercised, was, as we have shown above, surrendered by King John in Magna Charta; and at the time the Constitution of Tennessee was adopted the right of an intestate "to transmit his property by inheritance to his own descendants" was enjoyed, as Chancellor Kent says, "in the fullness and perfection of absolute right."

It is true that in ancient times the king, as *parens patriæ*, took into his possession the goods of intestates, but he took them not for his own use, and still less to make "a gift" of them to strangers. He took them, as said by this Court in the case above cited, "to the intent that they should be preserved and disposed of for the burial· of the deceased, the payment of his debts, to advance his wife and children, if he had any, and if not, then *those of his blood*." *Hughlett* v. *Hughlett*, 5 Hum., 464.

If the State had the right to take the property of Mrs. Morris and make "a gift" of it to strangers, the State had the right to keep it and appropriate it to her own use; but we suspect that no one will maintain, at this day, that the State has the right to confiscate the property of citizens who are guilty of no crime, whether such citizens be testate or intestate, sane or insane, living or dead.

It is certainly true "that the death of the owner extinguishes his title and ownership, and that the dead can have no vested property rights."

The complaint in this case is, however, not that the State despoiled Mrs. Morris of any of her property after her death, but that during her life it deprived her of the right "to transmit her property by inheritance to her own descendants or next of kin."

The Court is of the opinion that such a right is "property;" that Mrs. Morris was deprived of that property by the Act of 1885, and therefore that said Act is unconstitutional unless it can be shown that it is "the law of the land."

The clause, "law of the land," was defined in our earlier cases to mean "a general and public law, equally binding upon every member of the community;" but by our later cases it is defined to mean a law "which embraces all persons who are or may come into like situation and circumstances." *Vanzant* v. *Waddell*, 2 Yer., 270, 271; *Wally* v. *Kennedy*, 2 Yer., 555; *Bank* v. *Cooper*, 2 Yer., 605; *Jones* v. *Perry*, 10 Yer., 71, 72; *Sheppard* v. *Johnson*, 2 Hum., 296; *Budd* v. *State*, 3 Hum., 491; *State* v. *Burnett*, 6 Heis., 189; *McKinney* v. *Hotel Company*, 12 Heis., 107; *Mayor* v. *Dearmon*, 2 Sneed, 122; *State* v. *Rauscher*, 1 Lea, 97; *Davis* v. *State*, 3 Lea, 379; *Maney* v. *State*, 6 Lea, 221; *Hatcher & Lea* v. *State*, 12 Lea, 370, 371; *Woodard* v. *Brien*, 14 Lea, 523.

Laws public in their character, and otherwise unobjectionable, may extend to all citizens, or be confined to particular classes. Cooley's Con. Lim., p. 390.

And it matters not how few the persons are who may be included in a class. If all who are, or may come, into the liké situation and circumstances be embraced in the class, the law is general, and not partial. *Budd* v. *State*, 3 Hum., 492.

Citizens may be classified under Article I., Section 8, of the Constitution when the object of the Legislature is to subject them to the burden of certain disabilities, duties, or obligations not imposed upon the community at large. And citizens may be classified under Article XI., Section 8, of the Constitution when the object of the Legislature is to confer upon them certain rights, privileges, immunities, or exemptions not enjoyed by the community at large.

If the classification is made under Article I., Section 8, every one who is in, or may come into, the situation and circumstances which constitute the reasons for and the basis of the classification, must be subjected to the disabilities, duties, obligations, and burdens imposed by the statute, or it will be partial and void. And if the classification is made under Article XI., Section 8, every one who is in, or may come into, the situation and circumstances which constitute the reasons for and basis of the classification, must be entitled to the rights, privileges, immunities, and exemptions conferred by the statute, or it will be partial and void.

It follows that the cases which have been decided upon Section 8 of either of said articles are of equal value in arriving at the meaning of the

The Stratton Claimants *v.* The Morris Claimants.

expression "all who are, or may come into the like situation or circumstances," and counsel in argument have properly referred to cases decided upon each of said articles.

Before proceeding to examine those cases, it is proper to notice another limitation which is imposed upon the Legislature in making classifications of citizens. The limitation is stated by Judge Cooley as follows:

"The doubt might also arise whether a regulation made for any one class of citizens, entirely arbitrary in its character, and restricting their rights, privileges, or legal capacities in a manner before unknown to the law, would be sustained, notwithstanding its generality.

"Distinctions in these respects must rest upon some reason upon which they can be defended—like the want of capacity in infants and insane persons; and if the Legislature should undertake to provide that persons following some specified lawful trade or employment should not have capacity to make contracts, or to receive conveyances, or to build such houses as others were allowed to erect, or in any other way to make such use of their property as was permissible to others, it can scarcely be doubted that the Act would transcend the due bounds of legislative power, even though no express constitutional provision could be pointed out with which it would conflict. To forbid to a class the right to the acquisition or enjoyment of property in such a manner as should be permitted

to the community at large, would be to deprive
them of liberty in particulars of primary impor-
tance to their pursuit of happiness; and those
who claim the right to do so ought to be able
to show a specific authority therefor, instead of
calling upon others to show how and where au-
thority is negatived." Cooley's Con. Lim., pp.
390–393.

That statutory classifications should be "natural,
and not arbitrary," was recognized by this Court
in *Demoville* v. *Davidson County,* 3 Pickle, 218–223.

It is believed that an examination of the re-
ported cases will show that none of the legislative
classifications of citizens which have been sustained
by this Court, were arbitrary in their character.
It will also be seen that all of them were made
for one or the other of the following purposes,
viz.: (1) For the purpose of taxation, (2) for
police purposes, (3) for the necessary protection of
the particular class, (4) for the release of a class
from some particular obligation or liability.

In the case of *State* v. *Schlier,* 3 Heis., 286,
the classification was made for the purpose of tax-
ation. The Legislature imposed a privilege tax
upon photographers, which was graded according
to the size of the town in which the privilege
was exercised. There was nothing arbitrary in
such a classification. On the contrary, it was
natural and just. that the classification should be
based upon the idea that the profits of the busi-
ness would be proportioned to the size of the town,

and that the tax should be proportioned to the profits. Every member of the community was at liberty to engage in the business and to exercise his art either in a city, in a town, or in the country, as he might elect.

In the case of *Fulghum* v. *Mayor*, 8 Lea, 635, the classification was made for the purpose of taxation. A license tax was imposed for the privilege of keeping a hotel, but there was a proviso that hotels having less than ten rooms should pay no privilege tax. There was nothing arbitrary in such a classification. It was natural and right that the tax should be graded according to the earning capacity of the hotel, and every member of the community was at liberty to engage in the business, and to elect whether he would keep a hotel of ten rooms or less.

In the case of *Robbins* v. *Taxing District*, 13 Lea, 303, the classification was made for the purpose of taxation. A law provided that drummers, and all persons not having a regular licensed house of business in the taxing district, offering for sale or selling goods by sample should pay a special privilege tax. The classification in that case was not arbitrary. Before the law was passed resident merchants were required to pay a regular occupation tax, while traveling salesmen or drummers paid no tax. It was natural that the law should remedy this inequality by requiring drummers to pay a privilege tax. Every member of the community was at liberty to engage in the

mercantile business, and to elect whether he would. be a resident merchant or a drummer.

In the case of *State* v. *Rauscher*, 1 Lea, 96, the classification was made for police purposes, as a regulation of the sale of intoxicating liquors. . The sale of intoxicating liquors within four miles of an incorporated institution of learning was prohibited by a certain law, but there was a proviso in it that the law should not apply to the sale of such liquors within an incorporated town. The classification in that case was by no means arbitrary. It was supposed that the injurious consequences resulting from the sale of liquor near incorporated institutions of learning would be much reduced by restricting such sales to incorporated towns where adequate police force is usually maintained. It was therefore natural and right to restrict the sales to such towns. Every member of the community was at liberty to engage in the business, and to elect whether he would sell within an incorporated town or not; and every incorporated town was allowed the privilege of having such sales made within its limits.

Afterward the law was amended so as to divide the incorporated towns of the State into two classes, and to prohibit such sales in those towns which were organized under the Act of 1882, while the privilege of allowing such sales within their limits was continued to the other towns of the State. This classification was purely arbitrary. . The efficacy of the police of a town was in no

way dependent upon whether it was organized under the Act of 1882 or not; and, accordingly, this Court' held that the attempted discrimination between the different towns of the State was unconstitutional and void. *Hatcher & Lea* v. *State,* 12 Lea, 370, 371.

In the case of *Theilan* v. *Porter,* 14 Lea, 627, the classification was made for police purposes, to abate nuisances. An Act authorized "the several communities embraced in the territorial limits of all such municipal corporations in the State as have had, or may have, their charters abolished," etc., to condemn and abate as nuisances all houses which should be found to be in an unsanitary condition.

The classification in that case was not arbitrary, but based upon the natural distinction between houses in a sanitary and houses in an unsanitary condition; and every community whose charter had been or might be abolished, was entitled to the benefit of the police power conferred by the Act.

In the case of *Parks* v. *Parks,* 12 Heis., 634; the classification was made for the necessary protection of a class known as cotton merchants, factors, and brokers, by giving them a lien for the purchase-money for cotton sold. The classification was by no means arbitrary. The business in which those persons were engaged had a special need for such a lien. Every citizen of the State could engage in the business, and thus become entitled to the benefits of the lien.

The liens given to mechanics, landlords, carriers, and others, are all supported upon the same considerations. *Davis* v. *State*, 3 Lea, 380; *Demoville* v. *Davidson County*, 3 Pickle, 217.

In the case of *Davis* v. *State*, 3 Lea, 380, the classification was made for the necessary protection of witnesses from the rapacity of speculators, the speculation in witness' fees being deemed by the Legislature detrimental to the public service. Every citizen of the State who should become a witness would be entitled to the benefit of the protection afforded by the Act.

The Act did not deprive the witness of the power of free disposition of his fees as property, because the claim of a witness for fees, being only a chose in action, was not assignable at common law, and, as the Legislature first made such claims assignable, it was equally within its competency to take away that quality. Upon the same principle the Legislature may classify minors, married women, lunatics, and other persons under disability, and enact statutes "for their *assistance, comfort,* and *support.*" Cooley's Con. Lim., pp. 389, 390, 391. But in this State, while it is recognized as the duty of the government "to *protect and provide for* those who are incapable of taking care of themselves, it is the duty of the Legislature to pass *general* laws whereby this may be done." *Jones* v. *Perry*, 10 Yer., 75. The fact that it is the duty of the State to "*protect* and *provide* for those who are incapable of taking care of themselves," proves

that the State cannot legislate to *deprive them of their property rights.*

In the case of *Demoville & Co.* v. *Davidson County*, 3 Pickle, 218, the classification was made for the purpose of releasing all druggists from liquor-dealer's privilege taxes incurred by them, where the liquors were sold in good faith, for medical uses only, and the druggists' license was not used by them as a blind to sell liquors as a beverage. It was held by this Court that the class of druggists thus described by the Act form *"a natural and not an arbitrary class,"* and were properly distinguished in their treatment by the State from those who had been guilty of selling liquor under the guise of doing a regular druggist's business.

We will now refer to those cases where the Legislature has attempted to make certain classifications among citizens, which classifications this Court has held were *not* within the constitutional power of the Legislature to make.

In the case of *Morgan* v. *Reed*, 2 Head, 275, an Act of 1856 declared that the title of all persons to any slave sold under judicial proceedings under the Act of 1827, and to which the heirs distributees, etc., were not made parties, should be forever barred, unless suit should be brought within six months after the passage of the Act of 1856. It was held that the Act of 1856 was unconstitutional. The Act may, in fact, have embraced a large number of cases, in which very many persons

34—5 P

may have been interested; in fact, it was sought to be justified as a "relief measure;" but there were no reasons why the statute of limitations should be reduced to six months, in order to meet the exigencies of those cases that were not equally applicable to all other cases, where void or irregular sales of slaves had been made.

In the case of *Memphis* v. *Fisher*, 9 Bax., 239, an Act provided that municipal corporations with a population of 35,000 or more might prosecute suits without giving bond for costs. It was held to be unconstitutional. For, though municipal corporations possess some powers pertaining to sovereignty, yet, when they become suitors, they stand as individuals; and there were no reasons why they should be exempted from giving bond for costs that would not be equally applicable to an individual.

In the case of *Brown* v. *Haywood*, 4 Heis., 360, an Act provided that in any county of the State where civil suits had been removed from the county in which they had been originally brought, they should be transferred back to the original county upon the affidavit of three unconditional Union men of the original county, that justice could be done all parties. The Act was held to be unconstitutional. There were no reasons why suits already transferred should be sent back, that were not equally applicable to suits that might afterward be transferred; and there were no reasons why the affidavits of Union men should

have any more weight than the affidavits of other men.

In the case of *Wally* v. *Kennedy*, 2 Yer., 554, an Act provided that any suit brought in the name of an Indian reservee, to recover certain lands, should be dismissed if it were shown that it was being prosecuted for the benefit of any person other than the one in whose name suit was brought. The Act was held to be unconstitutional. There were no reasons why a suit prosecuted in the name of an Indian reservee, for the use of another, should be dismissed, that were not equally applicable to every case where the equitable owner of real estate sued in the name of the person holding the legal title.

In *Bank* v. *Cooper*, 2 Yer., 599, an Act of the Legislature undertook to deprive the debtors of the Bank of the State of Tennessee of the right of trial by jury and of the right of appeal. It was held to be unconstitutional. There were no reasons why the debtors of that bank should be deprived of their rights that were not equally applicable to all other debtors, where the debts arose from similar contracts.

In the case of *Budd* v. *State*, 3 Hum., 492, an Act created a new felony in relation to the officers, agents, and servants of the Union Bank. This Court held that it was unconstitutional. There were no reasons why the officers, agents, and servants of that bank should be subjected to the felony in question that were not equally applicable

The Stratton Claimants *v.* The Morris Claimants.

to the officers, agents, and servants of all other banks.

In the case of *McKinney* v. *Hotel Company*, 12 Heis., 104, an Act authorized a certain hotel company to contract to pay interest at the rate of ten per cent. per annum upon a loan of $100,000. The Act was held to be unconstitutional. There were no reasons why that company should be allowed to contract to pay ten per cent. interest that were not equally applicable to all other companies or individuals who might wish to borrow money; and there were no reasons why those who loaned money to that company should be allowed to charge ten per cent. that were not equally applicable to all the money lenders of the State.

In *Daly* v. *State*, 13 Lea, 232, an Act, in effect, created, as a new privilege, the right to sell pools on horse-races, and to limit the exercise of the privilege to a certain class of private corporations. This Court held the Act to be unconstitutional. There were no reasons why those corporations should be allowed the privilege of selling pools that were not equally applicable to all other corporations or individuals in the State who might wish to exercise that privilege.

In *Burkholtz* v. *State*, 16 Lea, 72, 73, an Act made it lawful to sell pools under certain circumstances, but it contained a proviso that it should not apply to counties having a population of less than 75,000 inhabitants by the United States census last taken just preceding the date of the

offense. Davidson and Shelby were the only coun-
ties in the State which had 75,000 inhabitants by
the last United States census. It was held that
the Act was unconstitutional. There were no
reasons why pool-selling should be made unlawful
in Davidson and Shelby Counties that were not
equally applicable to all the other counties of the
State.

In the case of *Woodard* v. *Brien*, 14 Lea, 522,
523, an Act declared that real estate should not
be affected by the lien of a judgment until an
abstract of the judgment was recorded in the
Register's office, but it contained a proviso that it
should apply only to counties that had, by the
census of 1870, a population of not less than 40,-
000 inhabitants. Davidson and Shelby were the
only counties in the State to which the Act could
apply. It was held to be unconstitutional. There
were no reasons why judgment liens should be re-
corded in those counties that were not equally ap-
plicable to all the other counties of the State.

In *Neeley* v. *State*, 4 Lea, 316, the charter of a
railroad company exempted its directors from jury
duty. The exemption was held to be unconstitu-
tional. There were no reasons why the directors
of that company should be exempted from jury
duty that were not equally applicable to all the
citizens of the State.

In *Green & Currey* v. *State*, 15 Lea, 708–710,
an Act provided that fifteen per cent. of the
voting population of a county might organize into

militia, and be exempt from jury duty. It was held that the exemption was unconstitutional. There were no reasons why those who. organized as mililitia should be exempt from jury duty that were not equally applicable to all the other citizens of the State.

In *Ragio* v. *State*, 2 Pickle, 272, an Act made it a misdemeanor for any one engaged in the business of a barber to keep open bath-rooms on Sunday. It was held that the Act was unconstitutional. There were no reasons why barbers should be prohibited from keeping bath-rooms open on Sunday that were not equally applicable to inn-keepers and all other persons who kept and used bath-rooms for profit.

We conclude, upon a review of the cases referred to above, that whether a statute be public or private, general or special in form, if it attempts to create distinctions and classifications between the citizens of this State, the basis of such classification must be natural, and not arbitrary.

If the classification is made under Article XI., Section 8, of the Constitution for the purpose of conferring upon a class the benefit of some special right, privilege, immunity, or exemption, there must be some good and valid reason why that particular class should alone be the recipient of the benefit.

If the classification is made under Article I., Section 8, of the Constitution for the purpose of subjecting a class to the burden of some special disability, duty, or obligation, there must be some

good and valid reason why that particular class should alone be subjected to the burden.

Another essential to the validity of every legislative classification, whether it be made under Article XI., Section 8, or under Article I., Section 8, is that it must not violate any other provision of the Constitution, whether such provision be expressed or implied.

Article I., Section 30, of the Constitution expressly provides that no hereditary emoluments, privileges, or honors, shall be granted or conferred in this State, and therefore the Legislature cannot, under Article XI., Section 8, grant any *hereditary* privileges or honors upon a class, however meritorious or large the class may be.

Though the Constitution does not expressly prohibit the taking of private property for private use, yet it has been held to do so by implication. *Harding* v. *Goodlett*, 3 Yer., 52; *Clark* v. *White*, 2 Swan, 549; *Memphis Freight Co.* v. *Mayor, etc.*, 4 Cold., 425; and therefore the Legislature cannot, under Article I., Section 8, deprive one class of citizens of their property to "give" it to another, however small or odious the class may be from which the property is taken, or however large and meritorious the class may be to which it is given.

Under Article I., Section 8, an individual may be deprived of his property in many instances where the action of the Legislature would be clearly constitutional.

The property of an individual may be taken by

summary proceedings for the payment of his taxes, or by judicial proceedings to compel the performance of his contracts, or to recover damages for the breach of his contracts, or for torts committed by him, or it may be taken as a punishment for his crimes. But the property of an individual cannot be taken under that section, or any other section of the Constitution, when it is taken from him *merely to "give" it to another.*

A law which violates any provision of the Constitution, whether the provision be expressed or implied, cannot be the "law of the land," because an unconstitutional law is, in fact, no law at all. Cooley's Con. Lim., p. 3.

The general statutes of descent and distribution of this State, as contained in the Code of 1858, §§ 2420–2430, classify the citizens of this State into those who die testate and those who die intestate. Any person who has capacity in the law to make a last will and testament can select the class to which he will belong. He may make his own will if he prefers to die testate, and if he prefers to die intestate he can adopt the disposition of his estate provided for in the statutes of descent and distribution. If he, from infancy, lunacy, or other disability, has not capacity in the law to make a will, he cannot select the class to which he will belong; he is forced into the class of intestates, and the disposition of his estate is necessarily controlled by the statutes of descent and distribution. Those statutes direct that the

land of an intestate owner shall descend to *his*
heirs, and that his personal property, after pay-
ment of debts, shall go to *his* next of kin.   In
no · instance do they direct that any part of his
estate shall go to those who are strangers in blood
to him.    They are in full accord with the princi-
ple announced by this Court, that it is the duty
of the State, by general laws, " *to protect and pro-
vide for* those who are incapable of taking care
of themselves." *Jones* v. *Perry,* 10 Yer., 75.

They do not proceed upon the novel idea that
the State has the right to seize upon the property
of an intestate minor or lunatic, and appropriate
it to the State's own use or "give" it away to
strangers.    On the contrary, they proceed upon
the ancient doctrine that the king took the cus-
tody of intestate property "*not* for his own use,"
but "to the intent that it should be preserved
and disposed of for the burial of the deceased, the
payment of his debts, to advance his wife and
children, if he had any, and if not, then those of
*his* blood."    *Hughlett* v. *Hughlett,* 5 Hum., 464.

They fully recognize that "the right to trans-
mit property by descent to *one's own offspring* is
dictated by the voice of nature."    2 Kent's Com.,
p. 326.

In their main features those statutes have stood
as the law of this State from the time of its ad-
mission into the Union down to the present time,
and, though various changes have been made in
them from time to time, the principle that a man's

intestate property shall go to *his own* heirs or next of kin has been at all times recognized and preserved until the passage of the Act of April 1, 1885, which is the Act in controversy in this case.

The Act, in brief, provides that if the personal estate of an intestate *lunatic* was derived from an *intestate* husband or wife it shall go, not to the next of kin of the lunatic, but to the next of kin of the person from whom it was so derived.

It is said, though incorrectly, that the Act of 1885 was modeled upon paragraph 3 of § 2420 of the Code of 1858, which provides that where land came · to the intestate by *gift, devise, or descent* from a parent, or the ancestor of a parent, and the intestate die *without issue,* if he have brothers or sisters of the paternal line of half-blood, and brothers and sisters of the maternal line also of the half-blood, then the land shall be inherited by such brothers and sisters on the part of the parent from whom the estate came, in the same manner as by brothers and sisters of the whole blood until the line of such parent is exhausted of the half-blood to the exclusion of the other line. If the intestate have no brothers or sisters, then it shall be inherited by the parent, if living, from whom or whose ancestors it came in preference to the other parent. If both parents be dead, then by the heirs of the parent from whom or whose ancestors it came.

It will be seen that paragraph 3 of § 2420 of

the Code applies impartially to all intestates, while the Act of 1885 applies only to *lunatic* intestates.

It is said that the proportion of lunatics to sane persons is as but one to a thousand. One objection to special laws is that they single out one or a few odious or helpless individuals and undertake to regulate his or their rights by a rule different from that which is applicable to the community at large, and by which the great body of the people, or the legislators themselves, would not be willing to be bound. *Wally* v. *Kennedy*, 2 Yer., 557; Cooley's Con. Lim., p. 391.

There are no reasons why lunatics should be deprived of the right to transmit their property by inheritance to their heirs or next of kin that do not apply equally to persons who are sane.

Suppose Mrs. Gee, who was a sister of Mrs. Morris, had derived personal property from an intestate husband, then, upon her death, as she was sane, the property would go under the general law to *her* next of kin; but under the Act of 1885 the property which Mrs. Morris derived from *her* husband must go to those who are strangers in blood to her. Why should so important a distinction be made between two sisters? The only answer which we have heard is, that one of them was sane and the other insane.

It will be seen that paragraph 3 of § 2420 of the Code applies impartially whether the property came to the intestate by *gift, devise,* or *descent,*

while the Act of 1885 applies only to property which came from an *intestate* husband or wife.

There are no reasons why an intestate widow should be deprived of the right to transmit to her own next of kin property inherited by her from her husband that do not apply equally to property which she may have derived from him by gift or bequest.

If K. J. Morris had bequeathed the property in controversy to his widow, the Act of 1885 would not have applied, and the property would have gone to *her* next of kin under the general law. But instead of making a written will he seems to have preferred to die intestate, and thus adopt the will which the State suggested for him in its general statute of distribution; and yet, merely because he left the property to his wife in the one way rather than in the other, she is to be deprived of the right to transmit it to her own next of kin.

It will be seen that paragraph 3 of § 2420 of the Code does not apply except where the intestate dies without issue, and yet the Act of 1885 would have deprived Mrs. Morris of the right to transmit her own property to her own children. Her children by a marriage prior or subsequent to her marriage with K. J. Morris would have been disinherited, and even her children by *him* would have taken *her* property, not as *her* next of kin but as *his*.

It will be seen that while paragraph 3 of § 2420

of the Code establishes a certain preference as between the heirs of an intestate, it does not direct that any part of his estate shall go to those who are strangers in blood to him; it does not deprive him of the right to transmit his own estate by inheritance to his own blood kin.  But the Act of 1885 deprives a lunatic widow of all power to transmit to any of her blood kin any of the personal property which she may have derived from her intestate husband, and directs that the whole of it shall go to those who have not a drop of her blood in their veins.

The minute classification and sub-classification adopted by the Act of 1885, first forced Mrs. Morris into the class known as lunatics, where the majority against her at once became a thousand to one.  It then forced her into a subclass composed of only those lunatics who had derived property from a husband or wife.  It then forced her into a still smaller subclass comprising only those lunatics who had derived property from an *intestate* husband or wife.

The probability is that there are very few persons in the State who would answer the description of the subclass into which Mrs. Morris was finally forced by the Act of 1885.  Assuming, however, that the Legislature has the power, in a proper case, to make its classification as minute as it sees proper, yet we hold that the classification must "be natural and not arbitary."

We think that the classification made by the

Act of 1885 is unnatural, arbitrary, and capricious, and for that reason we hold it to be unconstitutional. We are also of opinion that it deprived Mrs. Morris of the right to transmit her estate to her own next of kin; that such a right is "property;" that the Legislature undertook, in effect, to take her property away from her and "give" it to those who were strangers in blood to her; and as the Legislature cannot take private property for private use, the Act violates the Constitution, and for that reason it is not the "law of the land."

This conclusion renders it unnecessary to examine the constitutional questions as to whether the substance of the Act was sufficiently expressed in its title, or whether it sufficiently recites the law which it was intended to repeal or amend. This case, however, serves well to show that those requirements of the Constitution may have been intended to notify persons who may have an interest in opposing such legislation, as well as to inform the members of the Legislature of the true character of the legislation proposed to be enacted.

Upon the grounds above stated, we affirm the decree of the Chancellor. The costs of this Court will be paid by the appellants, the next of kin of K. J. Morris, deceased, and the costs of the Court below will be paid as adjudged by the Chancellor.

Judge Snodgrass dissents from the holding that the Legislature has not power to provide that estates of intestates shall go to others than those of their blood.