Harbison *v.* Knoxville Iron Co.

*HARBISON *v.* KNOXVILLE IRON CO.

(*Knoxville.* November 8, 1899.)

1. MASTER AND SERVANT. *Payment of employees' wages.*

Acts 1899, Ch. 11, requiring payment in money at face value, if presented on a regular pay day or not less than thirty days after issuance, of all coupons, scrip, punchouts, store orders, or other evidences of indebtedness issued to employees for wages, although the same are payable, by their terms, in merchandise, embraces all employers alike, whether they resort to said method of payment of their employees habitually and arbitrarily or only occasionally and without constraint of their employees. (*Post, pp. 426, 427.*)

Act construed: Acts 1899, Ch. 11.

2. INNOCENT HOLDER. *Of scrip purchased at discount from employees*

A purchaser, upon the open market, at fifteen per cent. discount, of such coupons, scrip, etc.. issued for employees' wages, as are required by Acts 1899, Ch. 11, to be paid in money at face value, is a *bona fide* holder thereof within the meaning of said Act, and entitled to recover thereon not merely the amount expended, but the face value of the paper. (*Post, p. 428.*)

Act construed: Acts 1899, Ch. 11.

3. CONSTITUTIONAL LAW. *Acts 1899, Ch. 11, is constitutional.*

Acts 1899, Ch. 11, requiring employers to pay in money at face value, if presented on a regular pay day, or not less than thirty days after issuance, all orders for merchandise and other like papers issued to employees for wages, is not an unconstitutional abridgment of the employer's right to contract. Said statute does not violate the "due procees of law" or the "law of the land" clauses of either the Federal or State Constitutions. It is both "due process of law" and "the law of the land" It is likewise a legitimate exercise of the police power. (*Post, pp. 429–448.*)

Act construed: Acts 1899, Ch. 11.

Constitution construed: Art. I., Sec. 8; U. S. Con., XIV. Amendmendment.

* On the question of the validity and effect of statutes requiring wages to be paid in lawful money there is a note reviewing the authorities with the case of Avent-Beattyville Coal Co. *v.* Com. (Ky.), 28 L. R. A., 273 —REPORTER.

4. SAME.   "*Due process of law*" *and* "*law of the land*" *are the same.*

The constitutional phrases, "due process of law" and "law of land," are of the same import, and that which is entitled to recognition as the one is to be recognized as the other also· (*Post, p. 431.*)

Cases cited: Railroad *v.* Harris, 99 Tenn., 704; 96 U. S., 101.

5. SAME.   *Liberty and property.*

The Court defines "liberty" and "property" as these terms are used in the "due process" and "law of the land" clauses·of the Federal and State Constitutions, and holds that the right of contract is an inherent part both of the right of liberty and of the right of property.   (*Post, pp. 429–431.*)

Constitution construed: Article I., Sec. 8;   U. S. Con., XIV. Amendment.

Cases cited: Dugger *v.* Ins. Co., 95 Tenn., 252; Bank *v.* Divine Grocery Co., 97 Tenn., 611; 98 N. Y., 98 (S. C., 50 Am. Rep., 640); 165 U. S., 589; 169 U. S., 391; 127 U. S., 684; 16 Wall., 127.

6. SAME.   *Corporations included in* "*due process*" *and* "*law of the land*" *clauses.*

A corporation is a "person" or "man" within the meaning, and entitled to the protection, of the "due process" and "the law of the land" clauses of the Federal and State Constitutions. (*Post, p. 429.*)

Constitution construed: Art. I., Sec. 8; U. S. Con., XIV. Amendment.

Cases cited: Dugger *v.* Ins. Co., 95 U. S., 250; Railroad *v.* Harris, 99 Tenn., 705; 164 U. S., 578; 165 U. S., 154.

7. SAME.   *Right of contract.*

The right of contract, though a part of the "liberty" and "property" of the citizen, may nevertheless be abridged, or even destroyed, by a statute that is, within the constitutional terms, "due process of law" and "the law of the land." (*Post, p. 431.*)

8. SAME.   "*Law of the land*" *defined.*

The Court quotes from the cases many useful and approved definitions of the term "law of the land," but recognizes and concedes the difficulty, if not impossibility, of giving a definition that is at once perspicuous, comprehensive, and satisfactory. "The law of the land" at any particular date is the whole

Harbison v. Knoxville Iron Co.

body of valid laws, statutory or otherwise, existing and in force in the State at that particular date. Every valid statute is the "law of the land" with respect to its subject-matter. The "law of the land" is constantly changing as new statutes are enacted and old ones repealed, or new principles evolved. (*Post, pp. 432–438.*)

9. SAME. *Statutes are the "law of the land," when.*

A general or public statute is valid as the "law of the land" which embraces all persons who are or may come into like situation and circumstances. To render special or class legislation valid as the "law of the land," it must, in addition, be based upon a classification that is natural and reasonable and not arbitrary and capricious. (*Post, pp. 434, 435.*)

Cases cited: Sutton v. State, 96 Tenn., 710; Railroad v. Harris, 99 Tenn., 705; Stratton v. Morris, 89 Tenn., 521; Henley v. State, 9° Tenn., 698.

10. POLICE POWER. *Exercise of.*

Under the police power the State has the right, and it is its duty, to enact and enforce all such laws not in plain conflict with some provision of the State or Federal Constitution as may rightly be deemed necessary or expedient for the safety, health, morals, comfort, and welfare of its people. This power expands to meet new conditions. The Legislature is invested with a large discretion in its exercise, and a strong presumption obtains in favor of the lawfulness of its exercise by the Legislature. The right of contract between employer and employees is a legitimate subject for the exercise of this power. (*Post, pp. 441–447.*)

---

FROM  KNOX.

---

Appeal from Chancery Court of Knox County. H. G. KYLE, Ch.

GREEN & SHIELDS for Harbison.

LUCKY, SANFORD & FOWLER for Knoxville Iron Co.

CALDWELL, J. The bill in this case was filed to collect an alleged indebtedness of $1,678. The Chancellor granted the relief sought, and the Court of Chancery Appeals affirmed his decree.

The defendant is a domestic corporation engaged in the manufacture and sale of iron and in the mining and sale of coal. It employs about two hundred laborers, and has one regular pay day each month, being that Saturday which is the nearest to the 20th of the particular month. On this day each employe is paid in cash the amount due him up to the first day of the month, but never up to the day of payment. On every Saturday in the month, however, the defendant holds itself in readiness to pay all of its employees the full amount then due them if they will receive it in orders for coal, at twelve cents per bushel, and the afternoon of every Saturday, from 1 o'clock to 5 o'clock, is set apart for that purpose. About 75 per cent. of all the wages earned by the laborers is paid in these coal orders. The orders are in the following form:

"Let bearer have ———— bushels of coal, and charge to my account.

"Signed, ——————————.

"Accepted ——————————, 1899.

"Knoxville Iron Company."

The complainant purchased six hundred and fourteen of these orders, aggregating $1,678, and

thereafter presented them to the defendant on a regular pay day and demanded payment in cash. Payment being refused, he brought this · suit to collect the several orders. He bases his ˉ action on Sections 1 and 2 of Chapter 11 of the Acts of 1899, which are in the following language, namely:

"SECTION 1. *Be it enacted by the* ˙ *General Assembly of the State of Tennessee,* That all persons, firms, corporations, and companies using coupons, scrip, punchouts, store orders, or other evidences of indebtedness ˙ to pay their or its laborers and employees, for labor, or otherwise, shall, if demanded, redeem the same · in the hands of such laborer, employe, or *bona fide* holder, in good and lawful money of the United States; *Provided,* The same is · presented and redemption demanded of such person, firm, company, or corporation using same as aforesaid, at a regular pay day of such person, firm, company, or corporation to laborers or employes, or if presented and redemption demanded as aforesaid by such laborers, employees, or *bona fide* holders, at any time not less than thirty days from the issuance or delivery of such coupon, scrip, punchout, store order, or other evidences of indebtedness to such employees, laborers, or *bona fide* holder, such redemption to be at the face value of said scrip, punchout, coupon, store order, or other evidence of indebtedness; *Provided ,further,* Said face value shall be in cash the . same as its purchasing power in goods, wares, and merchandise

at the commissary, company store, or other repository of such company, firm, person, or corporation aforesaid.

"SEC. 2. *Be it further enacted,* That any employe, laborer, or *bona fide* holder, referred to in Section 1 of this Act, upon presentation and demand for redemption of such scrip, coupon, punchout, store order, or other evidence of indebtedness aforesaid, and upon refusal of such person, firm, corporation, or company to redeem the same in good and lawful money of the United States, may maintain in his, her, or their own name, an action before any Court of competent jurisdiction against such person, firm, corporation, or company using same as aforesaid, for the recovery of the value of such coupon, scrip, punchout, store order, or other evidence of indebtedness, as defined in Sec. 1 of this Act."

The company defends upon three grounds:

(1) That the Act does not apply to a case like this;

(2) That complainant is not a *bona fide* holder; and

(3) That the Act is unconstitutional.

These defenses will be considered in the order named.

*First.* The substance of the first contention is that, by a correct construction, it must be held that "All persons, firms, croporations, and companies using coupons, scrip; punchouts, store or-

ders, or other evidences of indebtedness to pay their or its laborers or employees," means only such persons, firms, corporations, and companies as are accustomed to use coupons, scrip, punchouts, store orders, or other evidences of indebtedness to pay their or its laborers or employees, and as so use them arbitrarily; and that the defendant has no such custom, and is therefore not included in the terms of the Act. No reason is perceived by the Court for so restricting and limiting the broad and unqualified words of the statute. The evident intention of the Legislature was to include every person, firm, corporation, and company using coupons, scrip, punchouts, store orders, or other evidence of indebtedness to pay their or its laborers and employes, whether such use be habitual and arbitrary, or only occasional and without constraint.

But, if this were not true, the defendant is included by its own construction. The Court of Chancery Appeals found that the defendant is so accustomed to use coal orders; that it in that "way pays off about seventy-five per cent. of the wages earned by its employees," and that its course of business in that respect is one "whereby employes are systematically, in the main, settled with in coal orders instead of cash, and where, though there is no compulsion in form, yet, in fact, by holding back their wages such a motive power is brought to bear upon their freedom of choice as to practically amount to coercion;" that the facts

of the case "show a species of compulsion whereby the defendant takes advantage of the necessities or the improvidence of its employees, and so places them in a position where they feel compelled to take their wages in coal orders."

So that, by the true construction, and also by that suggested by the defendant, it is included in the provisions of the statute.

*Second*. It is next contended that complainant is not a *bona fide* holder, because he purchased the coal orders sued upon at a discount of fifteen cents on the dollar. It is true that complainant gave only eighty-five cents on the dollar for these orders, but that does not prevent him from being a *bona fide* holder within the meaning of the statute. He made the purchases upon the open market, fairly and honestly, and gave ten cents more on the dollar for the orders than they had usually sold for. To constitute him a *bona fide* holder, it is only necessary that he should have bought the orders fairly, honestly, and for a reasonable price, in good faith, as contradistinguished from bad faith.

The suggestion that complainant's recovery, if allowed at all, should be limited to the price paid, is conclusively answered by the provision of the statute that the redemption or recovery shall be for "the face value of such scrip, punchouts, coupons, store orders, or other evidences of indebtedness."

*Third.* Finally, it is said that the Act abridges the right of contract, and for that reason it is challenged as repugnant to that part of Section 1 of the Fourteenth Amendment to the Constitution of the United States which declares that no State shall "deprive any person of life, liberty, or property without due process of law," and to that part of Section 8 of Article 1 of the Constitution of Tennessee, which declares that "no man shall be   .   .   .   deprived of his life, liberty, or property but by   .   .   .   the law of the land."

A corporation is a "person" within the provision against deprivation of life, liberty, or property "without due process of law" (*C. & L. Turnpike Road Co.* v. *Sanford,* 164 U. S., 578; *Gulf, C. & S. F. Ry.* v. *Ellis,* 165 U. S., 154; *Dugger* v. *Insurance Co.,* 95 Tenn., 250); and it is a "man" within the provision against deprivation of liberty or property otherwise than by "the law of the land" (*Railroad* v. *Harris,* 99 Tenn., 705); hence, the defendant, which is a corporation, is entitled to the protection guaranteed by both provisions.

The "liberty" contemplated in each provision means not only the right of freedom from servitude, imprisonment, or physical restraint, but also the right to use one's faculties in all lawful ways, to live and work where he chooses, to pursue any lawful calling, vocation, trade, or pro-

fession, to make all proper contracts in relation thereto, and to enjoy the legitimate fruits thereof.

In *Matter of Jacobs,* 98 N. Y., 98 (S. C., 50 Am. R., 640); *Allgeyer* v. *Louisiana,* 165 U. S., 589; *Holden* v. *Hardy,* 169 U. S., 391; *Powell* v. *Pennsylvania,* 127 U. S., 684, "property," as the word is there used, signifies not only those tangible things of which one may be the owner, but everything he may have of an exchangeable value. It includes the right to acquire and dispose of property, and to make all lawful contracts essential to those ends; and such contracts are entitled to the ' same protection as the property itself. *Holden* v. *Hardy,* 169 U. S., 391; *Dugger* v. *Insurance Co.,* 95 Tenn., 252; *Bank* v. *Divine Grocery Company,* 97 Tenn., 611, 612. "In the privilege of pursuing an ordinary calling or trade, and of acquiring, holding, and selling property, must be embraced the right to make all proper contracts in relation thereto." *Allgeyer* v. *Louisiana,* 165 U. S., 591. "Labor is property, and as such merits protection. The right to make it available is next in importance to the rights of life and liberty. It lies, to a large extent, at the foundation of most other forms of property, and of all solid individual and national prosperity." *Slaughterhouse Cases* (dissenting opinion of Judge Swayne), 16 Wall., 127.

Therefore, the right of contract is undoubtedly an inherent part of the right of liberty, and also

of the right of property, and deprivation of it is equally forbidden. But none of them are unlimited rights. All are subject to the law's control, and may, at any time, be abridged or enlarged or even destroyed within constitutional bounds. None of them can be affected or taken away, except by "due process of law" or the "law of the land;" yet all of them may be curtailed or destroyed by that means. The declaration against deprivation "without due process of law," or otherwise than by "the law of the land," necessarily implies that deprivation may be rightly accomplished and justified by such process or law. What, then, is "due process of law," or "the law of the land?" The two phrases have exactly the same import, and that which is entitled to recognition as the one is to be recognized as the other also. *Davidson* v. *New Orleans,* 96 U. S., 101; *Railroad* v. *Harris,* 99 Tenn., 704; Cooley's Const. Lim. (5th Ed.), 431; Black's Const. Law, 479.

The present statute, if valid, is "the law of the land" as to the provisions thereof, and that which is accomplished by it is done "by due process of law." All valid laws, statutory and otherwise, now existing in this State, constitute the aggregate body of our present "law of the land;" and each part, each separate law that is complete in itself, may properly be called the "law of the land" as to the matter or matters

embraced therein. Some of these laws are old and some are new. They are constantly changing, and, for that reason, it is impossible to formulate a definition that will, at all times, include everything that may be or come within and exclude everything that may be or fall without, the true meaning of the phrase, "law of the land."

Recognizing the difficulty of giving any "definition which would be at once perspicuous, comprehensive, and satisfactory," Mr. Justice Miller said it was a part of wisdom to ascertain the intent and application of so important a phrase "by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasoning on which such decisions may be founded." *Davidson* v. *New Orleans,* 96 U. S., 104. A like view is still entertained and enforced by the Supreme Court of the United States. *Holden* v. *Hardy,* 169 U. S., 390.

Nevertheless, many useful and approved definitions are to be found, and a few of them are here repeated: "Due process of law is the application of the law as it exists in the fair and regular course of administrative procedure.", *Slaughterhouse Cases,* 16 Wall., 127. "As to the words from Magna Charta incorporated into the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at length settled down to

this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestricted by the established principles of private rights and distributive justice." *Bank of Columbia* v. *Okely,* 4 Wheaton, 244. "By 'the law of the land' is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society." Mr. Webster's Argument in *Dartmouth College* v. *Woodard,* 4 Wheaton, 518. " 'Due process of law' is process due according to 'the law of the land.' This process in the States is regulated by the law of the State." *Walker* v. *Sauvinet,* 92 U. S., 93. "Whatever in the regular administration of law in a State is general and impartial in its operations on all persons, is 'due process.' " 2 Tucker's Const. U. S., Sec. 390. "Law, in its regular course of administration through courts of justice, is due process, and when secured by the law of a State the constitutional requisition is satisfied (2 Kent. Com., 13); and 'due process' is so secured by laws operating on all alike, and not subjecting the individual to arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice." *Caldwell* v. *Texas,* 137 U. S., 697.

"It is sufficient, for the purposes of this case, to say that legislation is not open to the charge of depriving one of his rights without 'due process of law,' if it be general in its operation upon the subjects to which it relates, and is enforceable in the usual modes established in the administration of government with respect to kindred matters—that is, by process or proceedings adapted to the nature of the case." *Dent* v. *West Virginia,* 129 U. S., 124.

When applied to general legislation, "the clause 'law of the land' was defined in our earlier cases to mean a general and public law, equally binding upon every member of the community; but by our later cases it is defined to mean law 'which embraces all persons who are or may come into like situation and circumstances.'" (*The Stratton Claimants* v. *The Morris Claimants,* 89 Tenn., 521; *Sutton* v. *The State,* 96 Tenn., 703; *Henley* v. *The State,* 98 Tenn., 698); and when applied to special or class legislation it means, in addition, that "the classification must be natural and reasonable, not arbitrary and capricious." *Sutton* v. *The State,* 96 Tenn., 710; *Railroad* v. *Harris,* 99 Tenn., 705.

Though operating equally on all persons in like condition, while in existence, the "law of the land" on no subject can be truly said to be immutable. On the contrary, it is always subject to change, by diminution or enlargement, by re-

peal or substitution, as different and new conditions arise; otherwise there could be no advance in legislation or legal development, and the legislative department of the government would be wholly unnecessary and superfluous. The law is, in fact, a progressive science, and its growth must be allowed to keep pace with the advance of civilization.

Mr. Justice Matthews says: "This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law. . . . The Constitution of the United States was ordained, it is true, by descendants of Englishmen, who inherited the traditions of English law and history, but it was made for an undefined and expanding future, and for a people gathered and to be gathered from many nations and of many tongues; and while we take just pride in the principles and institutions of the common law, we are not to forget that in lands where other systems of jurisprudence prevail the ideas and processes of civil justice are also not unknown. 'Due process of law,' in spite of the absoluteism of continental governments, is not alien to that code which survived the Roman Empire as the foundation of modern civilization in Europe, and which has given us that fundamental ·maxim of distributive justice —*suum cuique tribuere.* There is nothing in Magna Charta, rightly construed as a broad charter of public right and law, which ought to exclude the

best ideas of all systems and of every age; and as it was the characteristic principle of the common law to draw its inspiration from every fountain of justice, we are not to assume that the sources of its supply have been exhausted. On the contrary, we should expect that the new and various experiences of our situation and system will mold and shape it into new and not less useful forms." *Hurtado* v. *California*, 110 U. S., 531.

Some of the changes made in the common law, as the result of intelligent progress during the present century, are enumerated by Mr. Justice Brown, as follows:

"The whole fabric of special pleading, once thought to be necessssary to the elimination of the real issue between the parties, has crumbled to pieces. The ancient tenures of real estate have been largely swept away, and land is now transferred almost as easily and cheaply as personal property. Married women have been emancipated from the control of their husbands and placed upon a practical equality with them with respect to the acquisition, possession, and transmission of property. Imprisonment for debt has been abolished. Exemption from execution has been largely added to, and in most of the States homesteads are rendered incapable of seizure and sale upon forced process. Witnesses are no longer incompetent by reason of interest, even though they be parties to the litigation.

Harbison *v.* Knoxville Iron Co.

Indictments have been simplified, and an indictment for the most serious of crimes is now the simplest of all." *Holden* v. *Hardy,* 169 U. S., 386.

When first adopted in Magna Charter, the phrase, "the law of the land," had reference to the common and statute law then existing in England; and when embodied · in our Constitution, it referred to the same common law as previously modified, and so far as suited to the wants and conditions of our people in a new country. At present "the law of the land" embraces the same body of laws as still further modified; those parts validly cut off being now excluded, and those validly added being now included. Every valid statute · of the State now in existence, whenever enacted, is the present "law of the land" in respect to the subject-matter of that statute; and every existing enactment, passed with due form and ceremony and not in conflict with some provision of the State or Federal Constitution, is a valid statute; and · no statute otherwise valid, is unconstitutional because affecting one's life, liberty, or property, if, when being general, it embraces all persons · who are or may be in like situation and circumstances (*The Stratton Claimants* v. *The Morris Claimants,* 89 Tenn., 521; *Henley* v. *The State,* 98 Tenn., 698), or, when being special, it is, in addition, natural and' reasonable in its classification (*Sutton* v. *The State,* 96 Tenn., 710;

*Railroad* v. *Harris,* 99 Tenn., 705), or, as other-
wise expressed, "if it be general in its operation
upon the subjects to which it relates, and is en-
forceable in the usual modes established in the ad-
ministration of government with respect to kindred
matters." *Dent* v. *West Virginia,* 129 U. S., 124.

Confessedly, the enactment now called in ques-
tion is, in all respects, a valid statute, and free
from objection as such, except that it is chal-
lenged as an arbitrary interference with the right
of contract, on account of which it is said that
it is unconstitutional and not the "law of the
land" or "due process of law."

The Act does, undoubtedly, abridge or qualify
the right of contract, in that it requires that cer-
tain obligations payable in the first instance in
merchandise shall in certain contingencies be paid
in money; yet it is as certainly general in its terms,
embracing equally every employer and employee who is
or may be in like situation and circumstances,
and it is enforceable in the usual modes estab-
lished in the administration of government, with
respect to kindred matters. The exact and pre-
cise requirement is that all employers, whether
natural or artificial persons, paying their employees
in "coupons, scrip, punchouts, store orders, or
other evidences of indebtedness," shall redeem the
same at face value in money, if demanded by
the employee, or a *bona fide* holder, on a regu-
lar pay day, or at any time not less than thirty

days from issuance (Sec. 1); and that if payment be not so made upon such demand, the owner may maintain a suit on such evidence of indebtedness and have a money recovery for the face value thereof in any Court of competent jurisdiction. Sec. 2.

There is no prohibition against the issuance of any of the obligations referred to, nor against payment in merchandise or otherwise according to their terms, but only a provision that they shall be paid in money at the election and upon a prescribed demand of the owner. In other words, the effect of the Act is to convert into cash obligations such unpaid merchandise orders, etc., as may be presented for money payment on a regular pay day, or as much as thirty days after issuance.

Under the Act, the present defendant may issue weekly orders for coal as formerly, and may pay them in that commodity when desired by the holder; but instead of being able, as formerly, to compel the holder to accept payment of such orders in coal, the holder may, under the Act, compel defendant to pay them in money. In this way, and to this extent, the defendant's right of contract is affected.

Under the Act, as formerly, every employee of the defendant may receive the whole or a part of his wages in coal orders, and may collect the orders in coal, or transfer them to some one else

for other merchandise, or for money. His condition is bettered by the Act, in that it naturally enables him to get a better price for his coal orders than formerly, and thereby gives him more for his labor; and yet, although the defendant may not in that transaction realize the expected profit on the amount of coal called for in the orders, it in no event pays more in dollars and cents for the labor than the contract price.

The scope and purpose of the Act are thus indicated. The Legislature evidently deemed the laborer at some disadvantage under existing laws and customs, and, by this Act, undertook to ameliorate his condition in some measure by enabling him, or his *bona fide* transferee, at his election and at a proper time, to demand and receive his unpaid wages in money rather than in something less valuable. Its tendency, though slight it may be, is to place the employer and employee upon equal ground in the matter of wages, and, so far as calculated to accomplish that end, it deserves commendation.

Being general in its operation and enforceable by ordinary suit, and being unimpeached and unimpeachable upon other constitutional grounds, the Act is entitled to full recognition as the "law of the land," and "due process of law," as to the matters embraced, without reference to the State's police power, as was held of an Act imposing far greater restrictions upon the right

of contract in the case of *Dugger* v. *Insurance Co.,* 95 Tenn., 245, and as had been previously decided in respect of other limiting statutes therein mentioned. *Ib.* 253, 254.

Furthermore, the passage of this Act was a legitimate exercise of police power, and upon that ground also the legislation is well sustained. The first right of a State, as of a man, is self-protection, and with the State that right involves the universally acknowledged power and duty to enact and enforce all such laws, not in plain conflict with some provision of the State or Federal Constitution, as may rightly be deemed necessary or expedient for the safety, health, morals, comfort, and welfare of its people. *City of N. Y.* v. *Miln,* 11 Peters, 139; *Passenger Cases,* 7 Howard, 457; *Slaughterhouse Cases,* 16 Wall., 36-62; *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S., 746; *Bowman* v. *Railroad,* 125 U. S., 465; *Lawton* v. *Steele,* 152 U. S., 136; *Reelfoot Lake Levee District* v. *Dawson,* 97 Tenn., 172; *Smith* v. *The State,* 100 Tenn., 494; *Austin* v. *The State,* 101 Tenn., 567; Cooley's Const. Lim. (5th Ed.), 706; Black's Const. Law, Sec. 154, and other authorities too numerous to mention.

This power is an important and comprehensive one, and its application must be expected and allowed to expand and take in new subjects from time to time, as trade and business advance and new conditions arise. The scope of its exercise,

within the bounds already mentioned, is limited only by the requirement that it shall not arbitrarily and unreasonably affect the citizen in his life, liberty, and property. It cannot be an excuse for oppressive legislation (*Davidson* v. *New Orleans*, 96 U. S., 97; *Yick Wo* v. *Hopkins*, 118 U. S., 356); but it covers everything relating to the public interests, and, in its exercise, a large discretion is necessarily vested in the Legislature, which, in the first instance, is presumed to know not only what the welfare of the public requires, but also what measures are necessary for its advancement. *Kidd* v. *Pearson*, 128 U. S., 1; *Lawton* v. *Steele*, 152 U. S., 136.

The right of contract and of property is always subject to reasonable limitation under the State's reserved police power. As to this, Chief Justice Shaw said:

"We think it a well-settled principle, growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that its use may be so regulated that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. . . . Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment, as shall prevent them from

being injurious, and to such reasonable restraints and regulations established by law as the Legislature, under the governing and controlling power vested in it by the Constitution, may think necessary and expedient." *Commonwealth* v. *Alger,* 7 Cush., 53, 84.

This language is quoted by Judge Cooley in his Constitutional Limitations, on page 707, and by Mr. Justice Brown, in *Holden* v. *Hardy,* 169 U. S., 392.

It is readily seen from the analysis already given that the limitation placed upon the right of contract by this Act is not arbitrary and oppressive, but entirely just and reasonable. While in some sense qualifying certain contracts of the employer, it in no sense works a great hardship upon him. It only requires that, in certain events, he shall pay the wages of his employee in money, rather than in something less desirable. The Legislature, as it thought, found the employee at a disadvantage in this respect, and by this enactment undertook to place him and the employer more nearly upon an equality. This alone commends the Act and entitles it to a place on the statute book as a valid police regulation.

Besides the amelioration of the employee's condition in the way mentioned, the Act was intended and is well calculated to promote the public peace and good order, and to lessen the growing tendency to strife, violence, and even blood-

shed in certain departments of important trade and business. In the case of *Holden* v. *Hardy,* already referred to, the Court held that a statute of Utah, making it a misdemeanor to employ laborers to work under the ground or in smelters for a period of more than eight hours per day except in cases of emergency, was valid as a police regulation. In the conclusion of the opinion in that case, the Court mentioned the disadvantage of the employee in the matter of contracting, and justified the State's interference for his protection; and, in doing so, used the following well-chosen language:

"The Legislature has also recognized the fact, which the experience of legislators in many States has corroborated, that the proprietors of these establishments and their operatives do not stand upon an equality, but that their interests are, to a certain extent, conflicting. The former naturally desire to obtain as much labor as possible from their employes, while the latter are often induced by the fear of discharge, to conform to regulations which their judgments, fairly exercised, would pronounce to be detrimental to their health or strength. In other words, the proprietors lay down the rules, and the laborers are practically constrained to obey them. In such cases, self-interest is often an unsafe guide, and the Legislature may properly interpose its authority." 169 U. S., 397.

In that case, as in this one, the counsel of

the employer urged that the Act worked a peculiar hardship upon the employer, in that it violated his right to contract as he pleased. To that contention the Court aptly replied: "The argument would certainly come with better grace and greater cogency from the latter class. But the fact that both parties are of full age and competent to contract does not necessarily deprive the State of the power to interfere where the parties do not stand upon an equality, or where the public health demands that one party to the contract shall be protected against himself. 'The State still retains an interest in his welfare, however reckless he may be. The whole is no greater than the sum of all the parts, and when the individual health, safety, and welfare are sacrificed or neglected, the State must suffer.' " *Ib.*

Acts touching the question of contracts between employer and employee in different ways have been passed in several of the States. Most of them, unlike ours, have been both prohibitory and penal. Some have stood the test of constitutionality in the States where passed, and others have not. Enactments against the use of merchandise orders instead of money in the payment of wages have been adjudged unconstitutional and void in Pennsylvaina, Missouri, and West Virginia, in some instances upon the ground that the legislation was partial, and in others, for the additional reason that it was deemed an arbitrary interference with

the right of contract. *Godchilds* v. *Wigeman,* 113 Pa., 431 (S. C., 6 Atl. R., 354); *Showalter* v. *Ehlan* (Pa.), 4 Gen. Dig., 350; *State* v. *Loomis,* 115 Mo., 307 (S. C., 21 L. R. A., 621).

But, after the decision of the last-named case, the Court deciding it upheld an Act of similar import, though more general in its application (*Peel Splint Co.* v. *State,* W. Va., 17 L. R. A., 385); and an Indiana statute requiring the payment of wages in lawful money of the United States, and not otherwise, has been adjudged valid as to antecedent contracts to the contrary, in the case of *Hancock* v. *Yaden* (Ind.), 6 L. R. A., 576. Likewise, a Kentucky statute, providing that wage earners "shall be paid for their labor in lawful money," has been, by the Court of last resort in that State, treated as valid when applied to cases contemplated by the Legislature in passing it, but, at the same time, the Court held the statute to be inapplicable to a case where the laborer, in advance of reasonably frequent pay days, voluntarily applied for and received a merchandise order for wages not yet due. *Avent Beattyville Coal Co.* v. *Commonwealth,* 28 L. R. A., 273.

The Supreme Courts of Massachusetts, Rhode Island, and Maryland have sustained as constitutional statutes requiring the weekly payment of wages (*Re House Bill* 1230, Mass., 28 L. R. A., 344; *State* v. *Manufacturing Co.* (R. I.), 17 L. R. A., 856; *Shaffer* v. *Manufacturing Co.,* 55 Md.,

74), while the Supreme Court of Illinois has held the contrary in respect to a like statute. *Braceville Coal Co.* v. *People,* 147 Ill., 66 (S. C., 22 L. R. A., 340).

An Act requiring biweekly payment of wages was adjudged constitutional in Indiana in the case of *Hancock* v. *Yaden,* 6 L. R. A., 576. Legislation limiting a day's work to eight hours has been adjudged unconstitutional, null and void in Illinois and Nebraska, because special, and also because an unwarranted infringement upon the right of contract (*Ritchie* v. *People,* Ill., 29 L. R. A., 79; *Lowe* v. *Printing Co.,* Neb., 24 L. R. A., 702); but a similar enactment has been sustained in Utah and in the Supreme Court of the United States as a valid police regulation. *Holden* v. *Hardy,* 169 U. S., 366, 369.

Numerous other cases bearing upon these and other aspects of the same general subject are readily found, but their citation at this time is unnecessary.

The Act before us is perhaps less stringent than any one considered in any of the cases mentioned. It is neither prohibitory nor penal, not special but general, tending toward equality between employer and employee in the matter of wages, intended and well calculated to promote peace and good order, and to prevent strife, violence and bloodshed. Such being the character, purpose, and tendency of the Act, we have no hesitation in holding that it is valid, both as general

legislation, without reference to the State's reserved police power, and also as a wholesome regulation adopted in the proper exercise of that power.

It does not work an arbitrary and oppressive deprivation of the right of a solvent debtor to use, sell, and convey a part of his property in the payment of a part of his debts in good faith, as did the Act held to be obnoxious to the Constitution in the case of *Bank* v. *Divine Grocery Co.,* 97 Tenn., 603, 610, but, in its relation to the right of contract, it is somewhat closely related to that legislation which prohibits, nullifies, and vitiates the stipulation in fire insurance policies, known as the three-fourths clause, which was sustained as constitutional in the case of *Dugger* v. *Insurance Co.,* 95 Tenn., 245. In the course of the opinion in this case, Judge Beard observed that "the right of contracting with regard to one's own is subject to legislative control and conditions," and the observation was abundantly illustrated and supported by the citation of many limiting statutes and well considered cases. *Ib.,* 253, 254.

In the case of *Truss* v. *The State,* 13 Lea, 311, an enactment which so far affected the contract rights of purchaser and seller of cotton as to forbid its sale between "sunset and sunrise," was treated as a legitimate exercise of legislative power, though only the sufficiency of the title was actually discussed in the opinion.

Let the decree be affirmed.