# IN THE COURT OF APPEALS OF TENNESSEE
# MIDDLE SECTION AT NASHVILLE

**FILED**

**June 18, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

THE CITY OF WHITE HOUSE,      )
                                           )

     Plaintiff/Appellee,          )       )
                                           )

                                           )

VS.                                  )      Sumner Chancery
                                         )      No. 95C-41

                                         )

LAWRENCE RAY WHITLEY,       )      Appeal No.
District Attorney General for the      )      01A01-9612-CH-00571
Eighteenth Judicial District of the    )
State of Tennessee,               )
ET AL.,                              )

                                         )

     Defendants/Appellants.      )

# DISSENTING OPINION

The sole issue on this appeal is whether Tenn. Const. art. I, § 8 requires municipal court judges to be licensed lawyers if they exercise concurrent jurisdiction with general sessions courts in cases involving violations of state law within the territorial limits of their municipality. Issues relating to the qualifications of Tennessee's judges are of compelling public importance requiring deliberate, careful consideration. I cannot concur with either the court's methodology or its result.

## I.

The City of White House lies in both Robertson and Sumner Counties. It was incorporated in 1971 using a mayor and aldermanic charter authorized by Tenn. Code Ann. §§ 6-101, -134 (1971).[1] The enabling statutes at that time did not provide for a municipal judge, and in fact, Tenn. Code Ann. § 6-132 stated

---

[1] These statutes pertaining to mayor-aldermanic charters were repealed in 1991 and were replaced by Tenn. Code Ann. §§ 6-1-101 through 6-4-402 (1992 & Supp. 1996).

that the mayor had "all the powers of a justice of the peace within the municipality, for the purpose of keeping the peace and trying offenses against any ordinances or the laws of the state."

In 1972, the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment prohibited mayors from serving as judges when the fines, forfeitures, costs, and fees generated by their courts provided a substantial portion of the city's funds. *Ward v. Village of Monroeville,* 409 U.S. 57, 61, 93 S. Ct. 80, 83 (1972). Accordingly, in 1973 the General Assembly enacted Tenn. Code Ann. § 17-123 (Supp. 1973)[2] to empower the governing body of the municipality to establish the office of municipal judge by ordinance. Rather than prescribing specific qualifications for the office, Tenn. Code Ann. § 17-123[3] left the matter of the judge's qualifications to the city's governing body.

From 1973 until 1988, the Board of Mayor and Aldermen of White House appointed various lawyers to serve as municipal judge, presumably in accordance with Tenn. Code Ann. § 17-123.[4] When the person serving as municipal judge resigned in 1988, the Board of Mayor and Aldermen, following a practice common in other parts of the state, requested the general sessions judges from Robertson and Sumner Counties to act as White House's municipal judge. Accordingly the general sessions judge from Sumner County presided over the cases arising in the part of the city located in Sumner County, and the general sessions judge from Robertson County presided over the cases arising in the part of the city located in Robertson County. Both these general sessions court judges were presumably licensed lawyers. Two years later, in 1990, the Board of Mayor and Aldermen appointed a licensed lawyer to serve as the city's sole municipal judge.[5]

---

[2]These statutes, as amended, are now codified at Tenn. Code Ann. §§ 16-18-101, -102 (1994).

[3]This statute is currently codified at Tenn. Code Ann. § 16-18-102(2) (1994).

[4]The record does not contain copies of the ordinances that would have been required for the appointment of a municipal judge.

[5]This appointment was presumably made in accordance with Tenn. Code Ann. § 16-18-101 (the successor to Tenn. Code Ann. § 17-123); however, the record does not contain a copy of the required ordinance.

In 1992 the Tennessee Supreme Court held that municipal judges could not constitutionally exercise concurrent jurisdiction over state criminal offenses if they were appointed as opposed to elected. *State ex rel. South Carthage v. Barrett,* 840 S.W.2d 895, 899 (Tenn. 1992). The General Assembly responded in 1993 by enacting Tenn. Code Ann. § 16-18-201, -207 (1994) authorizing incorporated municipalities to enact ordinances providing for the popular election of municipal judges.[6] Tenn. Code Ann. § 16-18-202 prescribes the qualification for these elected judges as follows: "[a]ny city judge elected by popular vote must meet the requirements established in article VI, § 4 of the Constitution of Tennessee for judges of inferior courts."

On February 17, 1994, the Board of Mayor and Aldermen enacted Ordinance 94-1 establishing a city court for the City of White House. Section 1-503(b) contains age, residence, and minimum education requirements but does not require the city judge to be licensed to practice law in Tennessee. The city judge has jurisdiction to try "persons charged with the violation of municipal ordinances." *See* Section 1-502(a). If the city judge is elected, he or she also has "the authority to exercise jurisdiction concurrent with courts of general sessions in all cases involving the violation of the criminal laws of the state within the corporate limits of the city." *See* Section 1-502(c).

In August 1994, the residents of White House elected Charles R. Bobbitt, Jr. as their first elected city judge. Mr. Bobbitt met all of the requirements for the office contained in Ordinance No. 94-1, § 1-503(b) but was not a licensed lawyer. Following the election, the District Attorneys General for the Eighteenth and Nineteenth Judicial Districts, that include Robertson and Sumner Counties, declined to prosecute violations of state statutes occurring within the White House city limits in the White House City Court. Their decision stemmed from a concern that prosecuting state warrants in the White House City Court might violate the defendants' due process rights because Judge Bobbitt was not a licensed lawyer. The district attorneys general received some support from the

---

[6]Tenn. Code Ann. § 16-18-201 establishes the electoral process as an alternative to the appointment process. Municipalities may continue appointing their municipal judges if they wish.

Attorney General and Reporter who rendered an opinion on June 16, 1994 stating that Judge Bobbitt "might also be disqualified from disposing of cases involving adults where such cases involve the possibility of incarceration or other deprivation of liberty." *See* Op. Att'y Gen. U94-91 (June 16, 1994). The attorney general's observation was based on an extrapolation from an earlier Tennessee Supreme Court decision holding that non-lawyer judges could not preside over juvenile delinquency hearings where the juvenile faced the possibility of confinement or other loss of liberty. *State ex rel. Anglin v. Mitchell,* 596 S.W.2d 779, 791 (Tenn. 1980).

The White House city officials desired to avoid requiring their police officers to travel to either Gallatin or Springfield to prosecute minor violations of state law occurring within the White House city limits. They requested the district attorneys general to reconsider their position, and when the district attorneys general declined, the City of White House filed suit in the Chancery Court for Sumner County seeking declaratory and injunctive relief. The trial court filed an opinion on March 27, 1996, concluding that city judges must meet all the qualifications in Tenn. Const. art. VI, § 4, that the Constitution of Tennessee does not require city judges to be "licensed to practice law or 'learned in law'," and that municipal court judges are not required by statute to be authorized to practice law. Accordingly, the trial court declared that "[c]oncurrent jurisdiction and authority with courts of general sessions as set forth in Title 40 in all cases of the violation of criminal laws of the State of Tennessee within the limits of municipality exists in the White House City Court." Later, on October 15, 1996, the trial court declined to issue a writ of mandamus directing the district attorneys general to prosecute state warrant violations in the White House city court and declared that the city judge could not order the Sumner County sheriff to incarcerate prisoners in the absence of a contract between White House and Sumner County.

## II.

The constitutional issue in this case transcends the status of the White House City Court. It raises fundamental questions concerning our modern

understanding of Tenn. Const. art. I, § 8. It will likewise affect the ability of non-lawyer judges presiding over general sessions and municipal courts throughout the state[7] to adjudicate cases involving the violation of state criminal statutes where the defendant faces the possibility of confinement or other loss of liberty. The present controversy should be resolved by applying Tenn. Const. art. I, § 8 to these circumstances. Regrettably, the court has abdicated its responsibility to interpret the constitution and has decided instead to predict how the Tennessee Supreme Court might decide the issue. Attempting to divine an answer from the *State ex rel. Anglin v. Mitchell* decision is little more than judicial guesswork. The Constitution of Tennessee deserves better.

The Constitution of Tennessee contains the fundamental principles that order our government and society. *Maxey v. Powers,* 117 Tenn. 381, 400, 101 S.W. 181, 186 (1907); *Bouldin v. Lockhart*, 69 Tenn. 195, 199 (1878); *State v. Turk,* 8 Tenn. (Mart. & Yer.) 286, 290-91 (1827). These principles do not remain static but rather gather meaning from experience. *National Mut. Ins. Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 646, 69 S. Ct. 1173, 1195 (1949) (Frankfurter, J., dissenting). Thus, as Justice Henry was so fond of reminding us, our constitution contains not just rules for the passing hour, but rather principles for an expanding future. *State ex rel. Anglin v. Mitchell,* 596 S.W.2d at 785; *Cumberland Capital Corp. v. Patty*, 556 S.W.2d 516, 530 (Tenn. 1977) (quoting Benjamin Cardozo, *The Nature of the Judicial Process* 83 (1921)). While we should remain committed to the growth and adaptation of constitutional principles, *Shousa v. Matthews Drivurself Serv., Inc.,* 210 Tenn. 384, 389, 358 S.W.2d 471, 473 (1962), we must make sure that new principles truly evolve from old ones. *Metropolitan Gov't v. Poe,* 215 Tenn. 53, 80, 383 S.W.2d 265, 277 (1964).

---

[7]Twenty-one of the 159 general sessions judges in Tennessee are not lawyers. In addition, 248 of the 343 incorporated cities in Tennessee have municipal courts. Approximately 75 of these courts are presided over by non-lawyer judges. *See* M. Lee Smith Publishers, *Tennessee Attorneys Directory* (1997); Municipal Technical Advisory Service, University of Tennessee, *Directory of Tennessee Municipal Officials* (1996). The number of city court judges with law degrees has increased since 1978 when only 57% of the municipal court judges were lawyers. Frederic S. Le Clercq, *The Tennessee Court System,* 8 Mem. St. U.L. Rev. 185, 437 (1978).

Of the three branches of government, the judiciary has the primary obligation, and privilege, to keep the constitution alive and relevant to contemporary society. The courts are the constitution's chief protectors, *Neely v. State,* 63 Tenn. 174, 185 (1874), and are the chief expositors of the fundamental principles it contains. *Metropolitan Gov't v. Tennessee State Bd. of Equalization,* 817 S.W.2d 953, 955 (Tenn. 1991); *State ex rel. Witcher v. Bilbrey,* 878 S.W.2d 567, 573 (Tenn. Ct. App. 1994). This responsibility falls not just on the Tennessee Supreme Court's shoulders. All the courts are participants in the ongoing constitutional dialogue, and thus lower courts, including intermediate appellate courts,[8] should not brush constitutional issues aside by rationalizing that the supreme court will eventually get around to addressing them.

Constitutional adjudication should not be shaped by judicial ingenuity or by individual judges' personal preferences or agendas. In order to avoid arbitrariness, judges must approach constitutional questions in a principled way that takes into account the text of the constitution and the history, structure, and underlying values in the entire document. Judges should also provide a full explanation of their resolution of constitutional issues. *Summers v. Thompson,* 764 S.W.2d 182, 188 (Tenn. 1988) (Drowota, J., concurring).

The analysis of any constitutional issue should begin with the text of the constitution itself. *Hatcher v. Bell,* 521 S.W.2d 799, 803 (Tenn. 1974); *Prescott v. Duncan,* 126 Tenn. 106, 128, 148 S.W. 229, 234 (1912). It is, after all, the constitution that the courts are expounding, *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 407, 4 L. Ed. 579, 602 (1819), not just the earlier decisions interpreting the constitution. *Graves v. New York ex rel. O'Keefe,* 306 U.S. 466, 491-92, 59 S. Ct. 595, 604 (1939) (Frankfurter, J., concurring). The meaning and significance of the text can be illuminated by considering the intentions of the drafters, *Hatcher v. Bell,* 521 S.W.2d at 803, the practices and usages in existence

---

[8]Prior to the enactment of the Appellate Court Efficiency Act in 1989, cases involving constitutional issues where no factual or other issues existed bypassed the intermediate appellate courts. The Tennessee Supreme Court no longer has exclusive jurisdiction over these types of cases, and they are now routinely presented to the intermediate appellate courts. *See* Act of April 13, 1989, ch. 147, § 2, 1989 Tenn. Pub. Acts 213, 213 (codified at Tenn. Code Ann. § 16-4-108(a)(2) (1994).

when the constitution was ratified, *Peay v. Nolan,* 157 Tenn. 222, 230, 7 S.W.2d 815, 817 (1928), the common law, *Williams v. Taxing District,* 84 Tenn. 531, 535 (1886), and the contemporary construction of the text by the legislature and the courts. *State v. Wilson,* 80 Tenn. 246, 265 (1883).

Prior judicial decisions play an important role in constitutional adjudication. They provide stability and consistency in constitutional understanding, *Monday v. Millsaps,* 197 Tenn. 295, 298, 271 S.W.2d 857, 858 (1954); *State ex rel. Pitts v. Nashville Baseball Club,* 127 Tenn. 292, 303, 154 S.W. 1151, 1154 (1913), and they also provide a safeguard against judges who might desire to import their own ideologies into the constitution by claiming to have new insights into the drafters' intentions. However, prior judicial decisions cannot trump the text of the constitution. As Judge Kennedy noted over one hundred and fifty years ago,

> I can never follow precedent, in the line of analogy, when it leads to an infraction of the constitution. Hence the necessity of a frequent recurrence to first principles. If we follow precedent, and move on according to analogy of cases, we shall be led from step to step until the constitution itself will be lost amidst the subtleties of the law.

*Bank v. Cooper,* 10 Tenn. (2 Yer.) 599, 622 (1831) (Kennedy, J., concurring). I fear that by focusing only on *State ex rel. Anglin v. Mitchell*, the court has ignored the first principles and has lost Tenn. Const. art. I, § 8 in the subtleties of the law.

## III.

The Tennessee Supreme Court has never held that Tenn. Const. art. I, § 8 or the Due Process Clause of the Fourteenth Amendment requires that all judges who preside over criminal adjudicatory proceedings involving adults must be lawyers. While it has held that due process prevents the use of non-lawyer judges in juvenile delinquency proceedings, it pointed out that "there is, perhaps some warrant for a lay judge in the disposition of small offenses and due process is not offended." *State ex rel. Anglin v. Mitchell,* 596 S.W.2d at 788. This observation is consistent with the United States Supreme Court's conclusion four years earlier

that the Due Process Clause of the Fourteenth Amendment did not require trying a criminal defendant before a non-lawyer judge when the defendant had the right to a de novo trial before a lawyer judge. *North v. Russell,* 427 U.S. 328, 339, 96 S. Ct. 2709, 2714 (1976).

Those who now desire to extend the holding of *State ex rel. Anglin v. Mitchell* to adult criminal adjudicatory proceedings in city courts must confront *North v. Russell.* Virtually every other state court addressing the issue has reached a result consistent with the *North v. Russell* decision. *See Palmer v. Superior Court,* 560 P.2d 797, 799 (Ariz. 1977); *Shoemaker v. State,* 375 A.2d 431, 439 (Del. 1977); *Treiman v. State ex rel. Miner,* 343 So.2d 819, 823 n.2 (Fla. 1977); *Walker v. State,* 420 S.E.2d 17, 18-19 (Ga. Ct. App. 1992); *People v. Sabri,* 362 N.E.2d 739, 744 (Ill. App. Ct. 1977); *Broussard v. Town of Delcambre,* 458 So. 2d 1003, 1004 (La. Ct. App. 1984); *Jenkins v. Canaan Mun. Court,* 366 A.2d 208, 209 (N.H. 1976); *People v. Charles F.,* 458 N.E.2d 801, 802 (N.Y. 1983); *Commonwealth v. Dessus,* 396 A.2d 1254, 1260-61 (Pa. Super. Ct. 1978); *State v. Duncan,* 238 S.E.2d 205, 209 (S.C. 1977); *Masquelette v. State,* 579 S.W.2d 478, 480 (Tex. Crim. App. 1979); *Young v. Konz,* 558 P.2d 791, 793-94 (Wash. 1977), *aff'd en banc,* 588 P.2d 1360, 1364-66 (1979); *State ex rel. Collins v. Bedell,* 460 S.E.2d 636, 643-45 (W. Va. 1995); *Canady v. State,* 687 P.2d 897, 898-901 (Wyo. 1984).[9]

The United States Supreme Court is the final arbiter of federal constitutional rights. Accordingly, persons desiring to find that due process requires the use of lawyer judges in all adult criminal adjudicatory proceedings must look to their state constitutions for greater due process protections than those found in the Fourteenth Amendment. In this case, these expanded protections can exist only if differences in the wording, history, or construction of Tenn. Const. art. I, § 8 support the conclusion that its due process protections are more

---

[9]The Vermont Supreme Court declined to follow *North v. Russell* because the state did not afford criminal defendants the right to a de novo trial before a lawyer judge. *State v. Dunkerley,* 365 A.2d 131, 132 (Vt. 1976). Prior to *North v. Russell,* the state courts had been divided on the question. Compare *Ditty v. Hampton,* 490 S.W.2d 772, 775-76 (Ky. Ct. App. 1972); *Tsiosdia v. Rainaldi,* 547 P.2d 553, 555-56 (N.M. 1976) (approving the use of non-lawyer judges) with *Gordon v. Justice Court for Yuba Judicial Dist.,* 525 P.2d 72, 78-79 (Cal. 1974) (disapproving the use of non-lawyer judges).

expansive than those in the Fourteenth Amendment. The *State ex rel. Anglin v. Mitchell* decision does not delineate clearly how Tenn. Const. art. I, § 8 differs from the Fourteenth Amendment and, legal scholars have criticized it accordingly. Frederic S. Le Clercq, *The Constitutional Policy That Judges Be Learned in the Law,* 47 Tenn. L. Rev. 689, 729-32 (1980).

Many of our most fundamental rights and liberties receive protection from both the Tennessee and federal constitutions. The Tennessee Supreme Court has often noted that the United States Constitution provides a basic level of protection and that state constitutions may provide greater protection or may even protect rights that are not protected by their federal counterpart. *Burford v. State,* 845 S.W.2d 204, 207 (Tenn. 1992); *Davis v. Davis,* 842 S.W.2d 588, 600 (Tenn. 1992); *State v. Middlebrooks,* 840 S.W.2d 317, 338 (Tenn. 1992). The court has even found broader protections in the Constitution of Tennessee in a number of circumstances. *See, e.g., State v. Marshall,* 859 S.W.2d 289, 290-91, 294-95 (Tenn. 1993) (holding that the state constitution provides greater protection for free comment than the First and Fourteenth Amendments); *State v. Black,* 815 S.W.2d 166, 189, 192-193 (Tenn. 1991) (holding that the state constitution provides different standards for determining what constitutes cruel and unusual punishment); *State v. Jacumin,* 778 S.W.2d 430, 435-36 (Tenn. 1989) (holding that Tenn. Const. art. I, § 7 requires different standards for obtaining a search warrant than does the Fourth Amendment); *Miller v. State,* 584 S.W.2d 758, 760 (Tenn. 1979) (holding that the ex post facto clause in Tenn. Const. art. I, § 11 provides greater protection than the ex post facto clause in U. S. Const. art. I, § 10, cl. 1).

The decisions construing the "law of the land" clause in Tenn. Const. art. I, § 8 follow a similar path. Even though the Tennessee Supreme Court has noted that it could find expanded due process protections in the state constitution, *State v. Barnett,* 909 S.W.2d 423, 430 n.6 (Tenn. 1995); *Burford v. State,* 845 S.W.2d at 207; *Doe v. Norris,* 751 S.W.2d 834, 838 (Tenn. 1988), the court has consistently equated the due process protections in Tenn. Const. art. I, § 8 with the Due Process Clauses in the Fifth and Fourteenth Amendments. *Riggs v. Burson,* 941 S.W.2d 44, 51 (Tenn. 1997); *Davis v. State,* 912 S.W.2d 689, 696 (Tenn.

1995); *Nale v. Robertson,* 871 S.W.2d 674, 680 (Tenn. 1994); *State ex rel. Anglin v. Mitchell,* 596 S.W.2d at 786; *Dearborne v. State,* 575 S.W.2d 259, 262 (Tenn. 1978); *Harbison v. Knoxville Iron Co.,* 103 Tenn. 421, 431, 53 S.W. 955, 957 (1899).

Tenn. Const. art. I, § 8 and the Due Process Clause of the Fourteenth Amendment share similar values and spring from common constitutional milieus. Neither the court nor the State has pointed to differences in the wording, history, or construction of Tenn. Const. art. I, § 8 that require construing it differently from the United States Supreme Court's construction of the Fourteenth Amendment in *North v. Russell.* Accordingly, since the rule of law followed by the state and federal courts should, whenever possible, be consistent, *State v. Jones,* 598 S.W.2d 208, 219 (Tenn. 1980); *Miller v. State,* 584 S.W.2d at 763 (Harbison, J., dissenting), I would hold that Tenn. Const. art. I, § 8 does not require the use of lawyer judges in municipal courts exercising concurrent jurisdiction with the general sessions courts in cases involving the violation of state law within the territorial limits of the municipality.

Judicial proceedings have changed markedly during our two hundred years of statehood. Common-law pleadings have given way to new procedures; some proceedings are substantively more complex; and there is no longer a shortage of lawyers similar to the one existing when Tennessee became a state.[10] Thus, public convenience and sound judicial administration may very well favor providing for judges who are trained lawyers. However, the courts' response to this issue must be tempered by the doctrine of the separation of powers in Tenn. Const. art. II, §§ 1 & 2 and by the recognition that the Constitution of Tennessee does not require judges to be lawyers.[11]

---

[10]Charles Warren, *A History of the American Bar* 3 (1911); Frederic S. Le Clercq, *The Constitutional Policy That Judges Be Learned in the Law,* 47 Tenn. L. Rev. at 701-02.

[11]Professor's Le Clercq's assertion that the reception clause of Tenn. Const. of 1796, art. X, § 2 incorporates North Carolina's requirement that judges be "law trained" has not been judicially endorsed. *See* Frederic S. Le Clercq, *The Constitutional Policy That Judges Be Learned in the Law,* 47 Tenn. L. Rev. at 712-13.

The General Assembly has substantial authority over the organization of the judicial department. *Summers v. Thompson,* 764 S.W.2d 182, 193 (Tenn. 1988) (Drowota, J., concurring). It may prescribe qualifications for judges in addition to those contained in Tenn. Const. art. VI, 4, and, in fact, the General Assembly has enacted legislation requiring all state judges of courts of record to be licensed lawyers. Tenn. Code Ann. § 17-1-106(a) (1994). While there are no similar general requirements for general sessions or municipal court judges,[12] the General Assembly has enacted statutes requiring certain municipal court judges to be licensed lawyers.[13] The question of whether the General Assembly has exercised its power to prescribe the qualifications of municipal court judges in a responsible, even-handed manner is not before us in this case.[14] Accordingly, the question of the qualification of Tennessee's municipal court judges must be resolved by the General Assembly, not by the courts.

_____
WILLIAM C. KOCH, JR., JUDGE

---

[12]*Crawford v. Gilpatrick,* 646 S.W.2d 433,435 (Tenn. 1983) (stating that there are no general statutory qualifications for general sessions court judges); Frederic S. Le Clercq, *The Tennessee Court System,* 8 Mem. St. U.L. Rev. at 436.

[13]*See* Tenn. Code Ann. § 6-21-501(b)(3) (Supp. 1996) (requiring five cities with a city manager-commission form of charter to appoint a city judge who is an "attorney at law entitled to practice in the courts of the state"); Tenn. Code Ann. § 6-21-501(c)(1) (Supp. 1996) (requiring elected city judges in Hamilton and Knox Counties to be a "an attorney authorized to practice in the courts of the state"); and Tenn. Code Ann. § 6-33-102(a) (1992) (requiring city judges in cities under a modified city manager-council charter to be a "person licensed to practice law in the state of Tennessee"). Accordingly, the trial court's finding and the parties' stipulation that municipal court judges are not required by statute to be authorized to practice law is only partially correct.

[14]The State has not asserted in this case that the present statutory qualifications for municipal court judges or general sessions judges is contrary to the equal protection or class legislation provisions in Tenn. Const. art. I, § 8 or Tenn. Const. art. XI, § 8.